**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

LANCE MACK,

           Plaintiff,

            -against-

DELTA AIR LINES, INC; DELTA AIR LINE
GLOBAL SERVICES D/B/A DELTA GLOBAL
SERVICES; ARGENBRIGHT HOLDINGS LLC
d/b/a ERMC AVIATION SERVICES d/b/a UNIFI;
ALLSOURCE PPS, INC.; AGILE ONE; BARRY
COLBURN; and JOHN O'DWYER; in their
individual capacities and as aiders and abettors

           Defendants.

**SUMMONS &**
** COMPLAINT**


**JURY TRIAL DEMAND**

PLAINTIFF, LANCE MACK ("MACK" or "PLAINTIFF") by and through his

attorney, SPECIAL HAGAN, ESQ.,  complains of Defendants:  Delta Air Lines Inc.,

("DELTA");  DAL Global Services D/B/A/ Delta Global Services ("DGS"); Argenbright

Holdings LLC ("ARGENBRIGHT") d/b/a ERMC Aviation (ERMC) d/b/a UNIFI ("UNIFI");

AllSource PPS, Inc ("ALLSOURCE"); AgileOne ("AGILE1"); Barry Colburn

("COLBURN") and John O'Dwyer ("O'DWYER") in their individual capacities and as

aiders and abettors.


## I.    INTRODUCTORY STATEMENT

1. This is an action for injunctive relief, declaratory judgment, equitable relief, money

   damages and punitive damages on behalf of PLAINTIFF, LANCE MACK (MACK or

   PLAINTIFF).  MACK contends that he experienced racial discrimination, a racially

hostile work environment, a continuing violation of his rights; an ongoing retaliatory

hostile work environment based on his race and protected activities.

2. PLAINTIFF also alleges that he was defamed when he sought other job

opportunities at DELTA.  Specifically, Defendant O'DWYER would malign

3. PLAINTIFF to other managers in other divisions who had learned of MACK's work.

Ultimately, on several occasions, O'DWYER engaged in an ongoing campaign to

block MACK from professional opportunities, and to eventually terminate his

employment.

4. PLAINTIFF also alleges that he was misclassified as an independent

contractor/contingent employee, when in fact he functioned as an employee of Delta

Airlines.  Based on this misclassification, PLAINTIFF was denied vacation time, sick

leave and experienced.

5. PLAINTIFF also alleges that Defendants refused to engage in an interactive process

when he requested a reasonable accommodation.  PLAINTIFF was sought after for

other positions at DELTA that were not under DEFENDANT O'DWYER's

supervision.  However due to O'DWYER's repeated interference and

DEFENDANTS' repeated acquiescence, PLAINTIFF was unable to pursue and

explore other alternatives.  DEFENDANTS ended the interactive process and told

PLAINTIFF that his request to work elsewhere at DELTA was unreasonable.

6.  PLAINTIFF alleges that the terms, conditions and privileges of his employment relationship with Defendants have been adversely affected under:  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. al. seq. as amended (hereinafter "Title VII"); the Americans with Disabilities Act of 1990 (hereinafter" ADA");  Fair Labor Standards Act ("FLSA"); New York Labor Law; 42 U.S.C. § 1988; New York Labor Law §§ 650-665 (N. Y. Lab. Law");  the New York State Human Rights Law as contained in New York Executive Law § 296 et. seq. ("NYSHRL"); and the New York City Human Rights Law 8-107(1) et. seq. ("NYCHRL")

## II.    JURISDICTION AND VENUE

7.  This Court has jurisdiction over this action pursuant to §§ 1331 and 1343 to secure protection of and to redress the deprivation of rights secured by: ADA; Title VII;  and FLSA.

8.  This Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over the PLAINTIFF'S state and city law claims arising under the New York State Executive Law and the New York City Administrative Code respectively, because the PLAINTIFF'S federal, state and city claims derive from a common nucleus of operative facts and form part of the same case or controversy.

9.  PLAINTIFF's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201 and 2202.

### III.   **PARTIES**

10. MACK is an African American male.

11. PLAINTIFF worked for Defendants from 2016 to February 28, 2020.

12. At all times relevant, PLAINTIFF is an employee within the meaning of the ADA, FLSA Title VII, and the other statutes referenced herein.

13. MACK is a resident of the State and City of New York.

14. MACK has over 34 years of professional experience in law enforcement and security.

15. At all times relevant, DELTA AIR LINES, INC., is an employer within the meaning of the ADA, FLSA, Title VII and the other applicable statutes referenced herein.

16. At all times relevant, Defendant DELTA AIR LIINES, INC., (DELTA)  is a Delaware Corporation that is authorized to do business in the County, City and State of New York.

17. At all times relevant, Defendant DELTA has employed approximately 90,000 employees.

18. As defined by the FLSA, upon information and belief, DELTA engages in interstate commerce and has revenue in excess of $500,000.

19. At all times relevant, Defendant DAL Global Services, LLC d/b/a Delta Global Services (DGS) was a subsidiary of Delta Air Lines.

20. At all times relevant, DGS was an aviation services provider that offered aviation staffing and security related services.

21. At all times relevant, DGS employed approximately 19,000 employees.

22. As defined by the FLSA, upon information and belief, at all times relevant, DGS engaged in interstate commerce and had sales in excess of $500,000.

23. Upon information and belief Argenbright Holdings LLC, (ARGENBRIGHT) d/b/a ERMC Aviation d/b/a UNIFI (UNIFI) is a foreign corporation, which at all times relevant was authorized to and did conduct business in the County, City and State of New York.

24. At all times relevant, ARGENBRIGHT/ERMC/UNIFI is an employer within the within the meaning of the ADA, FLSA, Title VII and the other statutes referenced herein.

25. At all times relevant ARGENBRIGHT/ERMC/UNIFI has employed between 6,500 and 30,000 employees.

26. At all times relevant, ARGENBRIGHT d/b/a/ ERMC Aviation d/b/a UNIFI and DELTA jointly owned DGS.

27. As defined by the FLSA,  upon information and belief, ARGENBRIGHT d/b/a ERMC Aviation d/b/a UNIFI  engages in interstate commerce and has gross revenue in excess of $500,000.

28. At all times relevant, AGILE-ONE(AGILE1) is an employer within the meaning of the is an employer within the meaning of the ADA, FLSA, Title VII and the other statutes referenced herein.

29. Upon information and belief, Defendant AGILE1 is a foreign corporation, which at all times relevant was authorized to and did conduct business in the County, City and State of New York.

30. AGILE-1 represents itself to be: a diverse group of companies; that operates in 32 countries; that offers proprietary services and technologies in nearly every area of workforce management.

31. As defined by the FLSA,  upon information and belief, AGILE1 engages in interstate commerce and has sales in excess of $500,000 per year.

32. At all times relevant, ALLSOURCE PPS, INC., (ALLSOURCE)  is an employer within the meaning of the ADA, FLSA, Title VII and the other statutes referenced herein.

33. Upon information and belief ALLSOURCE is a foreign corporation, which at all times relevant is authorized to and conducts business in the County, City and State of New York.

34. ALLSOURCE is a payroll management company that serves as the named employer for contingent workers affiliated with their company.

35. As defined by the FLSA, upon information and belief, ALLSOURCE engages in interstate commerce and has sales in excess of $500,000.

36. At all times relevant, DEFENDANT JOHN O'DWYER ("O'DWYER") served as Delta's General Manager.

37. At all times relevant, O'DWYER, served as PLAINTIFF'S direct supervisor.

38. O'DWYER also acted directly and personally in the allegations stated herein.

39. O'DWYER personally and directly discriminated, defamed, harassed, marginalized and retaliated against PLAINTIFF.

40. DEFENDANT O'DWYER is sued here in both his individual capacity, he is also being sued as an aider and abettor.

41. At all times relevant, DEFENDANT BARRY COLBURN served as Delta's General Manager.

42. At all times relevant, COLBURN, served as PLAINTIFF'S direct supervisor.

43. COLBURN also acted directly and personally in the allegations stated herein.

44. COLBURN personally and directly discriminated, defamed, harassed, marginalized and retaliated against PLAINTIFF.

45. DEFENDANT COLBURN is sued here in both his individual capacity, he is also being sued as an aider and abettor.

## III. FACTUAL ALLEGATIONS

**Background Information**

46. Lance Mack was hired by DGS in December 2016 as a Security Performance Manager.

47. Based on his performance he was promoted to Corporate Regional Security Representative in 2017.

48. At this time, PLAINTIFF worked as a contingent worker.

49. O'DWYER became PLAINTIFF'S direct supervisor in August 2017.

50. Based on his performance, Plaintiff was again promoted in 2018 to Corporate Security Regional Manager.

51. At the time of his promotion, which was in October 2018, MACK was told that he went from being a "contingent worker" to a "merit employee."

52. As a merit employee he got vacation days and health benefits.

53. Based on this representation, MACK believed that he would eventually become a DELTA employee.

54. Instead,  O'DWYER repeatedly defamed MACK to DELTA colleagues to ensure that he would never be hired directly by DELTA.

**Delta's Misclassification Of Plaintiff's Positions & Reckless Failure To Pay Overtime**

55. DELTA entered into various corporate structures and hired contingent workers to avoid providing their employees with health insurance, vacation pay, overtime other DELTA flight perks.

56. DELTA  is liable under the FLSA and the NYLL  for failing to properly compensate Plaintiff for the overtime he performed between August 2017 and February 2020.

57. There are questions of law and fact, including but not limited to:

   a. Whether DEFENDANTS have failed and/or refused to pay Plaintiff and other Corporate Security Managers overtime pay for the hours they worked in excess of 40 hours per work week within the meaning of NYLL Article 19§§ 650 et. seq. and the supporting New York State Department of Labor Relations Regulations, 12 N.Y.C.R.R. Part 142.

   b. Whether Defendants have a policy of misclassifying contingent workers in the Corporate Security Unit as to exempt them from coverage of the overtime provisions of the NYLL;

  c. Whether Defendants' policy of misclassifying contingent workers in the Corporate Security Unit was done willfully;

  d. Whether Defendants' policy of misclassifying contingent workers in the Corporate Security Unit had a disparate impact on African Americans/Blacks; and

  e. Whether Defendant can prove that its unlawful policies were implemented in good faith.

58. Contingent workers in the Corporate Security Unit  performed the same jobs as full time salaried Delta employees.

59. For example, Plaintiff's job functions were also performed by DELTA Corporate Security Managers.

60. Unlike Plaintiff, DELTA Corporate Security Managers were paid between $85,000 and $110,000 a year.  They were also Grade 8 employees.

61. However, despite performing the same job functions with exponentially more responsibilities,

62.  PLAINTIFF  and the other Corporate Security Managers were on call 24 hours a day, 7 days a week.  Accordingly, he regularly worked over 40 hours a week during a 52 week period.

63. PLAINTIFF estimates that he worked at least 20 hours overtime a week from August 2017 until he was unlawfully terminated.

64. Further DEFENDANTS took steps to ensure that PLAINTIFF and his colleagues could not accurately record their work.  They refused to accept timesheets that reflected more than 40 hours of work.

65. If an employee submitted such timesheets, DEFENDANTS would insist that they worked more than 40 hours, DEFENDANTS would insist that they complete the timesheets again so that they would reflect that they only worked 40 hours.

66. PLAINTIFF and his colleague ARMANDO CORDOBA (CORDOBA) had the experience of their timesheets being returned when they attempted to report their overtime.

67. DEFENDANTS said there was a glitch in the system and insisted that PLAINTIFF and CORDOBA re-submit their timesheets so that they only reflected that they worked 40 hours in a given work week.

68. However, the reality was starkly different, PLAINTIFF and his colleagues regularly worked 60 to 80 hours a week without overtime compensation.

69. By the time he was terminated, PLAINTIFF, pursuant to the issued "Notice of Acknowledgment of Pay Rate and Pay Day under Section 195-1, MACK was paid at a rate of $40.38 per hour.

70. Pursuant to PLAINTIFF's 195.1 Notice, he was supposed to be compensated at a rate of $60.57 for any overtime he worked.

71. However, despite this requirement, PLAINTIFF from August 2018 until his unlawful termination in February 2020, Plaintiff regularly worked between 50 and 80 hours a week without compensation of any kind for the time he worked above and beyond 40 hours.

72. Ultimately, the precise number of times Defendants failed to compensate MACK for overtime can be ascertained from DEFENDANTS' records.

73. Plaintiff was therefore entitled to overtime.

74. O'DWYER ignored his complaints about not being compensated for overtime.

75. Racial minorities were disproportionately impacted by these policies.

76. Michael Takeda (TAKEDA) and CORDOBA were racial minorities similarly situated to MACK that were adversely impacted by these policies.

77. Despite working the same position as PLAINTIFF, under the same conditions, they were also deprived overtime while they worked under O'DWYER.

78. DELTA's Corporate Security Managers, were typically Caucasian and received substantially higher compensation and benefits.

79. DELTA's Corporate Security Managers performed the same job functions as PLAINTIFF, CORDOBA and TAKEDA, they also reported to O'DWYER.

80. Specifically, they were never hired as DELTA employees from any of DELTA's subsidiaries or contracted companies.

81. It was company policy to inform contingent workers that if they performed their jobs well, that they would eventually be hired by DELTA.

82. Caucasian contingent workers were hired as DELTA employees, while African Americans were not.

83. For example, George Taylor, Kevin Michel and Anna Catherine Mauro made the transition from contingent workers to DELTA employees.

84. Upon information and belief, TAYLOR, MICHEL and MAURO are all Caucasian.

85. Upon information and belief, DELTA did not hire any African American contingent workers from 2016 to February 2020.

86. Caucasian ALLSOURCE employees were given favorable work assignments, were allowed to transition from ALLSOURCE to DELTA employees more readily, and enjoyed other benefits consistent with the status of full time DELTA employees.

87. Upon information belief, DELTA hired the following Caucasian contingent workers: George Taylor, Kevin Michel and Anna Catherine Mauro.

**PLAINTIFF Experiences Racially Hostile Work Environment Under O'DWYER And Defendants**

*O'DWYER's Discriminatory, Violent and Sexually Inappropriate Comments*

88. PLAINTIFF began to learn that he would be working in a racially hostile work environment under O'DWYER at his interview on August 2017.

89. O'DWYER gave an account of an incident where he chose to chase and physically assault a Latino employee that he suspected of engaging in prohibited behavior.

90. Although it was not necessary for O'DWYER to apprehend and attack the employee, because he worked for the company, he chose to do so anyway.

91. It was clear to PLAINTIFF that O'DWYER's violent zealousness in pursuit of this employee was rooted in racial animus, after O'DWYER made the statement:

*"Latinos are like cue balls, the harder you hit them the better their English gets."*

92. Even though MACK was concerned about O'DWYER before he took the position, he had hoped that O'DWYER's comment was an aberration and not reflective of his actual discriminatory animus against anyone who was not a Caucasian and or heterosexual.

93. O'DWYER offered PLAINTIFF the position within his unit.

94. PLAINTIFF was wrong to hope that O'DWYER's statement was an isolated remark.

95. Therefore, despite this initial encounter, PLAINTIFF took the position because he was led to believe by O'DWYER that the position would lead to formal employment with DELTA.

96. Formal employment with DELTA would mean better pay and benefits.

97. Similarly situated DELTA Corporate Security Managers were Grade 8 employees. They were also paid at a salary between $85K and $110K rather than the $40 an hourly rate Mack received until the termination of his employment.

98. Therefore, PLAINTIFF took a chance and hoped that O'DWYER's behavior at his interview was an aberration, it was not. On countless occasions, O'DWYER would make discriminatory remarks about PLAINTIFF and other minorities, below are examples but not exhaustive of the statements made by O'DWYER that when PLAINTIFF complained to DEFENDANTS went unaddressed:

      a) On February 28, 2018, in front of a group of Plaintiff's colleagues, O'DWYER asked PLAINTIFF: "Didn't I lock you up?" On that occasion, Plaintiff had begun to make a name for himself with other DELTA managers. Like many of the staff in DELTA's Corporate Security Unit, both PLAINTIFF and O'DWYER were former cops. At that time, it was clear that the racially tinged and inappropriate remarks were made to diminish Plaintiff's employment prospects. O'DWYER knew the connotation his comments would have with amongst his other former law enforcement peers, and sought to discredit Plaintiff by making the racially tinged and completely untrue statement. In fact,

PLAINTIFF had a clean record until he left the NYPD and has never been arrested in his life.

b) On another occasion O'DWYER sought to harass PLAINTIFF by letting him know that he had worked in a neighboring precinct and that he knew some of PLAINTIFF's former colleagues.

c) On a golf outing in April 2018, in front of a DELTA Regional Manager that PLAINTIFF had developed a rapport with, O'DWYER suggested that he should carry the golf bags rather than actually play golf with them.   Again, O'DWYER sought to undermine me professionally and with discriminatory intent.

d) In a conversation MACK had with O'DWYER on another occasion, OWYER made racist and sexist comments about their African American colleague Nicole Sauce.  When he saw her, O'DWYER commented: "she shakes her titties and ass at us and we do whatever she asks us to do."  Again, MACK was disturbed by O'DWYER's comments and his apparent belief that he could freely make those types of comments. Further, MACK never heard O'DWYER make sexist objectifying comments about Caucasian heterosexual women.

e) In January 2018, during a call O'DWYER had with PLAINTIFF and SORIA, he stated that he did not trust an employee by the name of John Angel (ANGEL) because he was gay.  O'DWYER made the comment: "he played for the other team; that he was gay; and that he did not trust him as far as he could throw him."

f) O'DWYER also openly articulated his animus towards Joshua Mattson (MATTSON) another gay male that he supervised.  He also regularly made derogatory and homophobic remarks about MATTSON.

g) Similar to PLAINTIFF, O'DWYER sought to undermine MATTSON's career opportunities by falsely accusing him of abusing his travel privileges.  Allegations of this nature have the potential to lead to termination.  MATTSON was able to defeat O'DWYER's campaign, he was able to prove that he had not abused his travel privileges.

h) O'DWYER also went after Regional Manager Lisa Assaro (ASSARO), who is also openly gay.  O'DWYER harassed ASSARO with such intensity and frequency that she was eventually forced to resign based on the hostile work environment she endured.

99. In fact, until his termination PLAINTIFF would continue to hear either directly or indirectly from others about O'DWYER's animus towards racial minorities and members of the LGBTQ community.

100.    O'DWYER never made discriminatory or inappropriate comments about heterosexual Caucasians.

101.    O'DWYER would speak to PLAINTIFF and other African American and Latino staff in a more hostile, aggressive and unprofessional fashion.

102.    O'DWYER never conducted himself this way with heterosexual Caucasian staff members.

103.   On December 18, 2019, O'DWYER yelled at PLAINTIFF in front of other African American and Latino staff: "I am General Manager and I shouldn't have to do this shit!"

104.   O'DWYER directed the comment to PLAINTIFF despite the fact that he was not responsible for him having to address the case.  In comparison, when O'DWYER had to fill in for Caucasian employees, PLAINTIFF never witnessed him using profanity or yelling at them.  O'DWYER was professional and patient with Caucasian employees.

105.   It became even more apparent that O'DWYER wanted to push PLAINTIFF out at our bi-monthly, twice a month, one on one meetings.

106.   O'DWYER would use the meetings as a means to further harass PLAINTIFF. During the meetings, he would berate PLAINTIFF, suggest he wasn't grasping the concepts and would make racially derogatory comments.

107.   One of the more egregious examples of O'DWYER's comments took place in July 2018.  During one of the one on one meetings with PLAINTIFF he told PLAINTIFF that he made participants at their meetings uncomfortable because his skin was too dark.

108.   PLAINTIFF is a dark skinned African American male.

109.   O'DWYER made the comment and many others like it to further demean and demoralize PLAINTIFF.

110.   After any number of comments of this nature at the bi-monthly meetings, during conference calls, during social gatherings with O'DWYER, PLAINTIFF began to dread coming to work.

111.   O'DWYER made PLAINTIFF's environment so hostile that he experienced sleeplessness, anxiety and depression.

112.   O'DWYER made these comments despite PLAINTIFF's disproportionate workload.

113.   In January 2019, after performing the work of over three people for almost a year, PLAINTIFF came down with the flu and other medical complications.

114.   O'DWYER was on notice of PLAINTIFF's illness and his need for rest.

115.   Instead of allowing PLAINTIFF to rest, O'DWYER harassed him as if he were being compensated for being on call 24/7.

116.   To be clear, neither ALLSOURCE nor DELTA compensated PLAINTIFF for any overtime or any work performed outside of the 40 hour work week.

117.   MACK complained to O'DWYER about these blatant violations of the law.

118.   O'DWYER harassed and MACK while he was out on sick leave and being uncompensated.  On the two days MACK was out on sick leave, O'DWYER repeatedly called PLAINTIFF and asked when he was going to return to work.

119.   Immediately upon PLAINTIFF's return to work from sick leave, O'DWYER then placed MACK on a Performance Improvement Plan (PIP).

120.   The manufactured premise of the performance improvement plan was that PLAINTIFF needed to improve his accessibility and communication.

121.   O'DWYER contended that he could not reach PLAINTIFF on a 24/7 basis despite the fact that PLAINTIFF was not compensated for work outside of the 40 hour work week or when he was not clocked in at work.

122.  O'DWYER also made the racially tinged subjective assessment that MACK needed to improve his knowledge of the job and communications.

123.  Although O'DWYER maintained that PLAINTIFF's performance was sub-par, PLAINTIFF was assigned 27 stations with 8 Category X sites.

124.  PLAINTIFF"s assignments had the most traffic of any of DELTA's sites; PLAINTIFF also had the most sites of any of DELTA's Regional Managers throughout all of their facilities; additionally PLAINTIFF had the most Category X high target terrorist sites of any DELTA Regional Manager. This was despite O'DWYER's insistence that PLAINTIFF's performance was deficient.

125.  Unlike SORIA, PLAINTIFF did not receive a replacement to help him with the sites until one month after he complained that O'DWYER had discriminated against him.

126.  To be clear, PLAINTIFF was hired to relieve SORIA of a disproportionate workload, 27 sites was too many for SORIA to monitor alone.  However, from February 2018 to May 2019, PLAINTIFF a contingent worker, had to monitor all of these sites by himself without any training from SORIA, O'DWYER or anyone else.

127.  Despite DELTA's alleged prioritization of security, they allowed PLAINTIFF to monitor all 27 sites with 8 Category X sites by himself.

128.  The reality is that O'DWYER was setting up grounds to terminate MACK by giving him a workload that would be impossible for him to maintain by himself.

129.  From 2016 to 2020, O'DWYER never placed any Caucasian heterosexual employees under his supervision on a PIP.

130.  O'DWYER would schedule the meetings so that it would coincide with rush hour.

131.   DGS did not have complaint processes for employees who experienced discrimination and or retaliation on the job.

132.   Due to an absence of a policy, PLAINTIFF did not complain about the incidents that took place prior to December 31, 2018 when DGS was no longer his employer.

133.   Once the transition was clearly completed and O'DWYER had placed him on a racially motivated PIP,  Plaintiff's work environment had become some palpably hostile. It was at that juncture, in March 2019, MACK complained to ALLSOURCE, AGILE1 and DELTA.

**PLAINTIFF Experiences Disparate Treatment Under O'Dwyer**

134.   O'DWYER managed 17 staff: 7 direct reports including PLAINTIFF and 10 indirect reports.

135.   Before PLAINTIFF, O'DWYER did not have any African American direct reports.

136.   To rectify the lack of racial diversity amongst his staff, O'DWYER begrudgingly hired PLAINTIFF to support Danny Soria (SORIA).

137.   At the time of PLAINTIFF's hire under O'DWYER in August 2017, SORIA was monitoring all 27 sites throughout the North Eastern Region, including 8 Category X sites.

138.   Sites are designated "Category X" when they experience high foot traffic and are high targets for terrorist activity.

139.   For example, John F. Kennedy Airport, LaGuardia Airport, Newark Airport and Dulles Airport are both considered Category X sites.

140.   SORIA then later PLAINTIFF monitored all of these airports along with four other Category X sites by themselves.

141.   It was later conveyed to PLAINTIFF that he was hired to share SORIA's

workload, since SORIA who had over 20 years of experience could not monitor all

27 sites by himself.

142.   When O'DWYER hired PLAINTIFF, he shared with him that SORIA had a

drinking problem and had been arrested for a DUI.

143.   O'DWYER told PLAINTIFF that SORIA came to his job interview with him on

crutches and physically injured, after he had been in an altercation at a bar.

144.   SORIA was on crutches at his interview because his assailant at the bar had hit

him with his car.

145.   Despite being privy to all of this information, and the seriousness of the proposed

job, O'DWYER hired SORIA.

146.   O'DWYER continued to cover for SORIA and ignore his substance abuse

throughout his employment.

147.   SORIA, upon information and belief, a Caucasian male, was permitted to come

to work intoxicated.  He was permitted to close his door for extended periods of time

and drink on the job.

148.   SORIA was also allowed to work with a suspended license due a DWI.

149.   O'DWYER confided in PLAINTIFF that he knew that SORIA had a DWI and that

his license was suspended.  He also confided in PLAINTIFF that he knew SORIA

needed to have a valid license to work.  However, O'DWYER also shared with

PLAINTIFF that he had hidden this information from Randy Harrison (HARRISON)

and DELTA management.

150.   O'DWYER confided in PLAINTIFF that if DELTA management ever learned that he had concealed SORIA's DWI and inability to drive that both he and SORIA would be terminated immediately.

151.   Despite SORIA's ongoing substance abuse and inability to perform an essential function of the job, which was driving, O'DWYER nevertheless covered for him.

152.   O'DWYER permitted SORIA to work and provided SORIA with the support he needed to do so.  Including, hiring PLAINTIFF to split the 27 sites they were tasked with monitoring.

153.   Ultimately, SORIA was terminated in February 2018 after his misconduct at a company retreat in Las Vegas at the New York New York Hotel.

154.   At the retreat, O'DWYER and others made a number of racially disparaging remarks about PLAINTIFF because he refused to participate in their misconduct.

155.   SORIA eventually became intoxicated and was arrested because he got into a physical altercation with a prostitute.

156.   SORIA was charged with public intoxication, assault, and solicitation of prostitutes.

157.   SORIA was also physically assaulted and injured by the prostitute.

158.   Due to SORIA's conduct, DELTA and its affiliates were banned from returning to the hotel for any future conferences.

159.   Unlike with PLAINTIFF, O'DWYER sought to help SORIA in his job efforts.  This was despite his ongoing issues with substance abuse and performance.

160.   O'DWYER approached HARRISON about suspending rather than firing SORIA outright.

161.    HARRISON rejected O'DWYER's suggestion to suspend SORIA outright, and

insisted on termination because SORIA had "damaged the DELTA brand."

162.    Unlike with PLAINTIFF, O'DWYER continued to seek to assist SORIA in

procuring and pursuing job opportunities.

163.    O'DWYER confided in PLAINTIFF that he gave SORIA a glowing

recommendation when he sought a new position at ACT Activation.

164.    Indicative of SORIA's performance issues, he was terminated from ACT

Activation within a year.

165.    O'DWYER repeatedly advocated and supported SORIA a Caucasian male with

known substance abuse problems.

166.    O'DWYER did so to the detriment of DELTA's so called commitment to security

in some of the biggest terrorist targets in the world.

167.    However, despite PLAINTIFF's sustained performance for over a year, covering

all 27 sites and other positions at DELTA, O'DWYER engaged in an extensive

vendetta and campaign to destroy PLAINTIFF'S career prospects at DELTA.

**Defendants Retaliated After PLAINTIFF Complains of Discrimination and their
Failure to Compensate him For Overtime**

168.    Pursuant to the PIP, within 60 days of the execution of the PIP, MACK was

supposed to meet with O'DWYER to discuss his performance and compliance.

169.    O'DWYER failed to meet with MACK as per the PIP.

170.    Instead, without prior discussion with PLAINTIFF, O'DWYER arbitrarily extended

the probationary period.

171.   At that juncture, since Defendants did not adhere to the terms of the PIP, MACK
determined that the PIP was retaliatory and filed a complaint of discrimination in
March 2019.

172.   Upon information and belief, O'DWYER has never placed any Caucasian
employees on a PIP.

173.   Upon information and belief, O'DWYER has never extended any other
employees' PIP without prior discussion with the employee.

174.   O'DWYER intensified his harassment of PLAINTIFF upon his complaint of
discrimination and upon Defendants' determination that his discriminatory
statements and conduct were not grounds for termination.

175.   O'DWYER increased PLAINTIFF'S already disproportionate workload and
intensified his verbal harassment of MACK at their twice a month team meetings.

176.   DEFENDANTS then hired another African American, Troy Scott (SCOTT) within
a month of complaining of discrimination.

177.   Until then, PLAINTIFF was the only African American to directly report to
O'DWYER.

178.   SCOTT was also hired as an attempt to disguise DEFENDANTS' discriminatory
and retaliatory animus.

179.   DEFENDANTS also fired or failed to renew the employment of the employees
that corroborated MACK's claims about O'DWYER's discriminatory comments.

180.   REQUENA and CORDOBA supported MACK's complaint of discrimination.

181.   However along with MACK, because of their support of PLAINTIFF's claim, REQUENA and CORDOBA were both terminated around the same time as PLAINTIFF, before DELTA's mass layoffs in March 2020.

182.   Along with MACK, both REQUENA and CORDOBA are racial minorities who complained and engaged in protected activities against O'DWYER.

183.   However, DEFENDANTS worked in concert to ensure that all three men were terminated and precluded from pursuing future opportunities with DELTA or any of their affiliates.

184.   In comparison, Leo Ford (FORD) a Caucasian male was permitted to be laid off after DELTA/AGILE1 downsizing took place.

185.   This had the effect of allowing FORD to return to DELTA in the summer of 2020.

186.   Upon information and belief, FORD is a Caucasian male who never complained of discrimination or his working conditions.

187.   Upon information and belief, DELTA/ALLSOURCE/AGILE1 did not offer proposed return dates to any African American and or Latino workers under O'DWYER's supervision.

### O'Dwyer Further Retaliates: O'Dwyer Defames PLAINTIFF and Blocks His Opportunities to Work in Other Positions at DELTA

188.   O'DWYER's behavior became so egregious that MACK met with COLBURN in April 2019.

189.   A number of employees separated from PLAINTIFF's department and he took on their workloads.  MACK performed the work of several employees at once without additional compensation.

190.    Based on his performance work ethic several DELTA managers began to take notice of MACK and became interested in working with him.

191.    PLAINTIFF developed a rapport with Atlanta Regional Manager Jose Requena (REQUENA) and Manager Mark Lucas (LUCAS).  Both were interested in working with PLAINTIFF.

192.    O'DWYER proactively sought to thwart PLAINTIFF's professional opportunities with REQUENA and LUCAS.  Despite the fact that PLAINTIFF had not openly expressed an interest to work with either, O'DWYER took it upon himself to approach them about MACK and made the racially tinged comments that MACK was lazy and that he did not do enough work.

193.    O'DWYER made these comments to REQUENA and LUCAS despite the fact that MACK at the time was performing the work of three separate employees at the same time.

194.    At that time, MACK complained to COLBURN about  his work load and sought to be removed from his retaliatory hostile work environment.

195.    MACK conveyed first to COLBURN and then to AGILE1 that on several occasions between their meeting and his complaint, he had been sought after by other DELTA employees to work in their units.

196.    MACK conveyed to Defendants that word had gotten out about  his work ethic and that these other DELTA managers wanted to work with him.

197.    MACK also conveyed to DEFENDANTS that O'DWYER had retaliated against him because of his complaint and his efforts to seek employment elsewhere.

198.   O'DWYER told several of his co-workers that he made negative comments about PLAINTIFF because he sought other jobs and that was a reflection of his character.

199.   To be clear, O'DWYER began to go around in an unsolicited fashion, and ask employees at other airports if PLAINTIFF had sought positions on their sites.

200.   Instead of addressing MACK's repeated requests to be placed in other positions and his workload, COLBURN pretended that he needed to review the situation.

201.   When MACK complained to AGILE1 about O'DWYER's retaliatory defamation, they: a) chastised PLAINTIFF;

b)  told him that O'DWYER had a right to block his pursuit of other positions both on sight and elsewhere;

c)  stated that DELTA's findings would stand as is;

d)  said that his request for an accommodation was unreasonable; and

e)  instructed him to move forward with O'DWYER since O'DWYER had shown a willingness to do so on his end.

202.   MACK complained about the inadequacy of the investigation to DEFENDANTS. He pointed out that his witnesses corroborated his account of O'DWYER's racially inappropriate comments and conduct. MACK also complained that DEFENDANTS were forcing him to work in a hostile work environment with O'DWYER, to his detriment.

203.   Ultimately, PLAINTIFF was never removed from O'DWYER's supervision.

204.   Beyond supposed counseling and an alleged "compliance plan," O'DWYER never was disciplined.  O'DWYER never suffered any tangible adverse employment action for his conduct.

205.   DEFENDANTS further conveyed to PLAINTIFF that although O'DWYER's statements were not in good taste, and were inappropriate attempts at humor, that ultimately they were not grounds for his termination.

206.   PLAINTIFF was further told that since O'DWYER was willing to proceed with him in good faith, that he should also be willing to do so and out the allegations in his complaint behind him.

207.   In May 2019, O'DWYER conjured up a story that PLAINTIFF was late to a conference call.

208.   In this instance, ALLSOURCE contacted PLAINTIFF, to whom he had also complained of discrimination.

209.   ALLSOURCE did not investigate PLAINTIFF'S claims, and instead accepted DELTA's findings.

210.   As recently as a month before his termination, MACK was sought after for work and mentorship by below wing Director Michael Morrison (MORRISON).

211.   Again, when O'DWYER learned about MORRISON's interest in MACK, he began to make false and defamatory statements about PLAINTIFF.

212.   Due to O'DWYER's railroading, PLAINTIFF was again denied a professional opportunity to work elsewhere.

213.   When PLAINTIFF brought O'DWYER's antics up to DEFENDANTS, he was told that he had a right to express his views about PLAINTIFF to others.

214.   Plaintiff was not given any additional feedback on the retaliatory PIP he was placed on until he was ultimately terminated on February 28, 2020 on the specious premise that it was based on his performance.

215.   Defendants animus was so intense towards PLAINTIFF that they could not wait the additional month to terminate him.

216.   Upon information and belief, AGILE1 and DELTA ended the assignments of 800 similarly situated "contingent employees."

217.   However, since MACK's employment was not ended under these auspices, his separation from DELTA/AGILE1 is tainted by its designation as a termination under entirely separate grounds.

218.   Accordingly, because of DEFENDANTS unlawful conduct, PLAINTIFF is unfairly precluded from pursuing employment with any other units not managed by O'DWYER or at other DELTA sites.

219.   Due to the tight knit airport security community, due to the circumstances of his departure from DELTA, PLAINTIFF's employment prospects with other airlines and or at other airports have also been impacted.

**DEFENDANTS Fail to Engage in an Interactive Reasonable Accommodation Process**

220.   Due to the sustained abuse and harassment he endured from O'DWYER, PLAINTIFF sought a reasonable accommodation.

221.   PLAINTIFF began to experience anxiety, depression and emotional distress after he complained of discrimination.

222.   O'DWYER's abuse was relentless from the time of DEFENDANTS' resolution of his complaint in April 2019 until the time PLAINTIFF was ultimately terminated in February 2020.

223.   Emboldened by the outcome of the investigation, O'DWYER intensified his harassment of MACK.  He began to call and badger him on almost a daily basis.  He

also increased the frequency of their one on one meetings,  which O'DWYER knew

would exacerbate MACK's anxiety.

224.   O'DWYER did not meet with his other direct reports as frequently.

225.   O'DWYER did not call and harass his other direct reports as much as he called

MACK.

226.   Although O'DWYER claimed PLAINTIFF had performance issues, he had the

most responsibilities and the highest number of Category X terrorist sites of all of

O'DWYER's direct reports.

227.   MACK performed these job functions without complaint until MACK sought to

leave the racially hostile work environment he experienced under O'DWYER.

228.   Similar to the LGBTQ staff members that O'DWYER expressed open animus

towards, O'DWYER also took efforts to terminate and to thwart any professional

opportunities PLAINTIFF sought to pursue at DELTA.

229.   Due to the ongoing pressure and disproportionate workload, MACK sought

accommodations from both ALLSOURCE and COLBURN.

230.   Neither ALLSOURCE nor COLBURN made any substantive effort to engage in

an interactive process.

231.   ALLSOURCE said that DELTA determined that MACK's request for an

accommodation was unreasonable.  ALLSOURCE stood by the decision without

offering any viable alternatives.

232.   PLAINTIFF approached them about two other Operational Manager positions for

which he was approached and a Below the wing position.

233.   O'DWYER blocked these opportunities and stopped PLAINTIFF's attempts to engage in an interactive process.

234.   In the alternative, neither COLBURN, ALLSOURCE, nor AGILE1 provided any viable explanation as to why PLAINTIFF could not be placed in any of the Operation Manager jobs or the Below Wing position.

235.   None of the DEFENDANTS proposed any alternate positions either within DELTA or elsewhere.

236.   DEFENDANTS stopped the interactive process.

237.   DEFENDANTS insisted that PLAINTIFF remain in a racially and retaliatory hostile work environment under O'DWYER's supervision.

**FIRST CLAIM OF RELIEF:**
**(FAIR LABOR STANDARDS ACT: UNPAID OVERTIME WAGES)**
**AGAINST DEFENDANTS DELTA, DGS, AGILE1, ALLSOURCE AND UNIFI**

238.   Plaintiff, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

239.   At all times relevant, DEFENDANTS, DELTA, DGS, AGILE1, ALLSOURCE, and UNIFI have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of FLSA, 29 U.S.C. §§ 206(a) and 207(a).

240.   At all times relevant, DEFENDANTS DELTA, DGS, AGILE1, ALLSOURCE and UNIFI employed Plaintiff within the meaning of the FLSA.

241.   At all times relevant and continuing to the present time, DEFENDANTS had a policy and practice of refusing to pay overtime compensation to PLAINTIFF and

other contingent workers who performed work for DELTA's Corporate Security Unit, for work they performed in excess of 40 hours per week.

242.    PLAINTIFF was an hourly worker, compensated at a rate of $40.38 per hour.

243.    Pursuant to DEFENDANTS' Notice of Acknowledgement of Pay Rate and Payday Under Section 195.1, Plaintiff should have been compensated at a rate of $60.57 for any work performed in excess of 40 hours in a given 7 day work week.

244.    As a result of DEFENDANTS' willful failure to compensate their employees, including PLAINTIFF, at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a work week, DEFENDANTS have violated and continue to violate, the FLSA, 29 U.S.C. §§ 201 et.seq., including 29 U.S.C. §§ 207(a)(1).

245.    Plaintiff complained that he should have been compensated for the overtime he worked, and the fact that he was on call 24 hours a day 7 days a week.

246.    In response, DEFENDANTS recklessly and callously disregarded his complaints and increased his workloads in retaliation.  DEFENDANTS also blocked PLAINTIFF's efforts to work in other units.

247.    Plaintiff worked on an hourly basis.

248.    As a result of DEFENDANTS' FLSA violations, Plaintiff is entitled:

(a) to recover from DEFENDANTS his unpaid wages for all of the hours worked that constituted overtime compensation;

(b) to recover an additional, equal amount as liquidated damages for DEFENDANTS' willful violations of the FLSA; and

(c ) to recover their unreasonably delayed payment of wages, reasonable attorneys' fees, and costs and disbursements of this action.

## SECOND CLAIM OF RELIEF
## (RACE DISCRIMINATION IN VIOLATION OF TITLE VII, NYSHRL & NYCHRL)

249.   PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

250.   PLAINTIFF is an African American male.

251.   PLAINTIFF has over 34 years of applicable professional experience.

252.   PLAINTIFF was promoted twice during his tenure with DEFENDANTS.

253.   Based on his performance, PLAINTIFF was pursued by several DELTA managers.

254.   Also based on his competence, PLAINTIFF was able to perform the work of three employees. He monitored 27 sites by himself, 8 of which were Category X sites. PLAINTIFF acted in this capacity from March 2018 until he was unlawfully terminated in February 2020.

255.   PLAINTIFF was treated in a disparate fashion from his comparator SORIA, as well as DELTA's other Corporate Security Managers.

256.   PLAINTIFF and other similarly situated racial minorities and members of the LGBTQ community experienced discrimination under O'DWYER.

257.   O'DWYER made discriminatory remarks to  and about PLAINTIFF.

258.   O'DWYER also made racially discriminatory remarks about Latinos and members of the LGBTQ community.

259.   DEFENDANTS' contingent worker program had a disparate impact on racial minorities.

260.   Racial minorities who were contingent workers in the Corporate Security Unit were never hired as DELTA employees.

261.   While Caucasian contingent workers in the Corporate Security Unit were hired as DELTA employees.

262.   DEFENDANTS also treated racial minorities in the Corporate Security Unit in a disparate fashion.

263.   Caucasian employees within the Corporate Security Unit received favorable job assignments and job opportunities in comparison to their comparators who were racial minorities.

264.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

265.   As a proximate result of DEFENDANTS' racial discrimination against PLAINTIFF and his comparators, PLAINTIFF has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

266.   As a further proximate result of DEFENDANTS' actions, PLAINTIFF has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

267.   DEFENDANTS conduct was outrageous and malicious, and was intended to injure PLAINTFF's civil rights.  Therefore, PLAINTIFF is entitled to an award of punitive damages.

## THIRD CLAIM OF RELIEF
### (HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, NYSHRL AND NYCHRL)

268. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

269. PLAINTIFF is an African American.

270. Upon information and belief, O'DWYER and COLBURN are Caucasian males.

271. DEFENDANTS permitted an environment where discrimination, retaliation and harassment were permitted without consequence.

272. DEFENDANTS DSG, AGILE1, ALLSOURCE, ARGENBRIGHT and or DELTA did not have complaint procedures that would afford employees with recourse if they experienced discrimination.

273. DEFENDANTS engaged in an inadequate investigation process, despite PLAINTIFF's multiple complaints of discrimination.

274. As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses.

275. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

**FOURTH CLAIM OF RELIEF**
**(RETALIATION IN VIOLATION OF TITLE VII, NYSHRL & NYCHRL)**

276. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

277. PLAINTIFF complained of discrimination to DEFENDANTS on multiple occasions.

278. In March 2019, PLAINTIFF filed a complaint after DEFENDANTS put him on a retaliatory PIP and failed to provide him with any updates as to his performance.

279.    On April 5, 2019, DEFENDANTS began to fabricate grounds to critique PLAINTIFF's performance.  Their allegations were unfounded.

280.    In order to hide their retaliatory animus, in April 2019, DEFENDANTS hired SCOTT, an African American male.

281.    Until then, PLAINTIFF was the only African American direct report to O'DWYER.

282.    In May 2019, DEFENDANTS continued to lie about PLAINTIFF's performance and punctuality.  PLAINTIFF refuted these allegations.

283.    Due to these efforts, PLAINTIFF's attempts to move to other units was hampered.

284.    PLAINTIFF sought several positions at DELTA that DEFENDANTS blocked.

285.    DEFENDANTS used the manufactured performance issues to justify their conduct, this was despite the other managers' interest in PLAINTIFF.

286.    Further, DEFENDANTS allowed O'DWYER to openly thwart Plaintiff's efforts to obtain other positions within DELTA.

287.    DEFENDANT O'DWYER's conduct and vendetta were ongoing.  He continued to block PLAINTIFF's efforts to pursue other positions up until the last month of his employment.

288.    As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses.

289.    PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

**FIFTH CLAIM OF RELIEF**
**(RETALIATION & FAILURE TO ACCOMMODATE IN VIOLATION OF ADA, NYSHRL & NYCHRL)**

290.   PLAINTIFF, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

291.   PLAINTIFF suffers from depression and anxiety; therefore he has a disability as recognized by the ADA.

292.   PLAINTIFF disclosed his condition to DEFENDANTS and sought an accommodation.

293.   DEFENDANTS denied his request without offering an alternative.

294.   DEFENDANTS ended the interactive process.

295.   PLAINTIFF recommended several positions for which he was sought after.

296.   DEFENDANTS either thwarted these opportunities in retaliation and ignored these alternatives altogether.

297.   DEFENDANTS never provided an explanation as to why PLAINTIFF was not eligible for the positions that he sought in other units.

298.   As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses.

299.   PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

**SIXTH CLAIM OF RELIEF:**
**(NEW YORK LABOR LAW: UNPAID OVERTIME WAGES)**

300.   Plaintiff, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

301.   At all times relevant to this action, PLAINTIFF Lance Mack was an employee and Defendants were employers within the meaning of the NYLL.

302.   The overtime wage provisions of Article 19 of NYLL and its supporting regulations apply to Defendant.

303.   Defendant failed to pay Plaintiff and other contingent workers in the Corporate Security Unit the overtimes wages to which they are entitled under the NYLL.

304.   By virtue of DEFENDANTS' failure to pay Plaintiff and other contingent workers in the Corporate Security Unit overtime wages for all hours in excess of 40 hours per week, they have willfully violated NYLL Article 19 §§ 650 et. seq., and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R., Part 142.  Defendants acted recklessly or in willful disregard of the FLSA and NYLL by instituting a policy and/or practice that did not allow Plaintiff and his other colleagues to record all hours worked, but only allowed them to report a maximum of 40 hours worked per week.

305.   As a result of DELTA's ongoing efforts to address its financial woes, DEFENDANTS willfully caused Plaintiff and other similarly situated contingent workers in the Corporate Security Unit to perform primarily non-exempt tasks.

306.   DEFENDANTS willfully failed to assess whether contingent workers in the Corporate Security Unit performed non-exempt tasks.  Defendants instituted a policy and practice where they knew of the overtime requirements, yet showed a reckless disregard of their obligations under the NYLL.

307.   As a result of DEFENDANTS' willful violations of the NYLL, Plaintiff and the other contingent workers in DELTA's Corporate Security Unit are entitled to recover from

Defendant their unpaid overtime wages, reasonable attorneys' fees and costs of the action, liquidated damages and pre-judgment and post-judgment interest.

## SEVENTH CLAIM OF RELIEF:
### (DEFAMATION)

308.    Plaintiff, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

309.    On multiple occasions, O'DWYER defamed PLAINTIFF to other DELTA employees who sought to work with him.  O'DWYER told DELTA employees who were interested in working with him as an Operations Manager, that MACK was lazy and had a poor work ethic.  Despite the fact that MACK performed more work than any other Corporate Regional Manager at DELTA.

310.    O'DWYER further defamed MACK when he told MORRISON that MACK was not a good worker. Once again, O'DWYER further his vendetta against MACK and made sure that he was not hired to work with MORRISON.

311.    O'DWYER's defamation campaign had one goal, to ensure that MACK was neither able to work for him anymore or anywhere else at DELTA.

312.    O'DWYER proceeded with this campaign by making the false statements that MACK was lazy and lacked any work ethic.  When in fact the opposite was true, MACK had the work load of three employees, and worked thousands of hours uncompensated.

313.    Due to O'DWYER's actions and words, PLAINTIFF was terminated and has not been able to pursue employment at DELTA or within the aviation community in the area of security.

314. Thereby, as a result of the foregoing conduct, MACK has suffered financial and emotional injury, and has incurred actual and special damages.

315. Also as a result of DEFENDANTS' conduct, PLAINTIFF has suffered and will continue to suffer severe mental anguish and pain, including loss of self-esteem, personal dignity and career fulfillment.

316. Plaintiff has also experienced distress which originated from the aforesaid mental suffering.   Plaintiff has confronted great inconvenience, indignity and risk, including but not limited to a loss of his livelihood a loss of his ability to meet various financial obligations.  Thus Plaintiff was inhibited and prevented from enjoying life, and was forced to undergo emotional injury which he will continue to experience in the future.

## EIGHTH CLAIM OF RELIEF:
## (TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT)

317. Plaintiff, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

318. MACK commenced his employment with DEFENDANTS in December 2016 as a contingent worker.

319. In October 2018, MACK received a promotion from DEFENDANTS where his status changed to that of a merit employee.

320. Therefore DEFENDANTS were on notice of PLAINTIFF's changed status and rights as a merit employee.

321. At which time, he was still paid on an hourly basis, however he now had the ability to earn vacation time and health benefits.

322.   Also as a merit employee, DEFENDANTS had to adhere to a process and terminate him for cause.

323.   DEFENDANTS placed PLAINTIFF on a performance improvement plan but contrary to their process, they never provided him with any feedback on his updates.

324.   Instead DEFENDANT O'DWYER, on multiple occasions, blocked PLAINTIFF's efforts to move to other units at DELTA.

325.   DEFENDANTS failed to adhere to their policies and procedures, and failed to provide PLAINTIFF with any opportunity to rectify his alleged performance deficiencies.  Without further discussion, between the period of April 2019 to February 28, 2020, DEFENDANTS then proceeded to terminate PLAINTIFF.

326.   This tortious interference by DEFENDANTS with PLAINTIFF's employment contract was willful and PLAINTIFF has incurred damages.

327.   PLAINTIFF has been unable, despite reasonable efforts, to find comparable employment.

## NINTH CLAIM OF RELIEF:
## (AIDING AND ABETTING)

328.   Plaintiff, realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

329.   The underlying violations of PLAINTIFF' civil rights have been established.  The Complaint is rife with allegations where the individually named Defendants personally participated in the discriminatory and retaliatory conduct alleged.

330.    As a result of the foregoing,  Plaintiff has lost wages, benefits, promotional and

job opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional

distress, loss of enjoyment of life, and has incurred damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

a)  A declaratory judgment that the practices complained of herein are unlawful
under the FLSA;

b)  An award of unpaid wages for all the hours he worked in excess of 40 in a work
week at a rate of time and one-half of the regular rate of pay due under the FLSA
and NYLL using the following common methodology for calculating damages:
(Annual Salary ÷ 52) ÷ 40)  X Total Number of Overtime Hours Worked X 1.5;

c)  An award of liquidated and/or punitive damages as a result of DEFENDANTS'
willful failure to pay for all hours worked in excess of 40 in a workweek
representing double the amount of the unpaid overtime award.

d)  An award of damages representing the employer's share of FICA, FUTA, state
unemployment insurance, and any other required employment taxes;

e)  Issuance of a declaratory judgment that the practices complained of in this
Complaint are lawful under NYLL Article 19 §§ 650 et. seq. and the supporting
New York State Department of Labor regulations;

f)  Injunctive relief, pursuant to NYLL, enjoining DEFENDANTS from engaging in
the practices alleged herein;

g)  An award of damages in the amount of 1,000,000 to compensate Plaintiff for his
mental anguish, humiliation, embarrassment and emotional injury.

h) An award of special damages in an amount of 1,000,0000 for loss of compensation and financial harm,

i) An award of damages for loss of compensation and financial harm including lost salary, income, fringe benefits, for a period of at least 5 years after PLAINTIFF's date of discharge, in an amount that cannot be accurately determined at this time but is estimated to exceed $500,000.

j) An order enjoining DEFENDANTS from further defamatory statements

k) An award of prejudgment and post-judgment interest;

l) An award of costs and expenses of this action together with reasonable attorneys' and experts' fees and an award of a service payment to Plaintiff;

m) Such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised in this Complaint.


Dated:  Queens, New York,
January 31, 2021                          By:            /s Special Hagan
                                                                  _____
                                                                  Law Offices of Special Hagan,
                                                                  Esq.
                                                                  196-04 Hollis Avenue
                                                                  Saint Albans, New York, 11412
                                                                  Telephone: (917) 337-2439
                                                                  special@haganlawoffices.net
                                                                  Attorney for Plaintiff