UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LANCE MACK,                                        Case No.: 21-CV-00519(BMC)

                                   Plaintiff,      **SECOND AMENDED**
                                                   **COMPLAINT**

                    -against-
                                                   **JURY TRIAL DEMAND**

DELTA AIR LINES, INC, DELTA AIR LINE
GLOBAL SERVICES D/B/A DELTA GLOBAL
SERVICES, ALLSOURCE PPS, INC.,
AGILE ONE, BARRY COBURN, and JOHN
O'DWYER,

                                   [1]Defendants.
------------------------------------------------------------------X

      Plaintiff, LANCE MACK ("Mack"), by and through his attorneys, BAKER GREENSPAN

& BERNSTEIN, ESQS., complaining of DELTA AIR LINES, INC ("Delta"), DELTA AIR LINE

GLOBAL SERVICES d/b/a DELTA GLOBAL SERVICES ("DGS"), ALLSOURCE PPS, INC.

("Allsource"), AGILE ONE ("Agile1"), BARRY COBURN ("Coburn"), and JOHN O'DWYER

("O'Dwyer") (collectively, "Defendants"), alleges with personal knowledge, the following:

## **INTRODUCTION**

      1.     This is an employment action for money damages, liquidated damages, and punitive

damages on behalf of Mack, who worked in Defendants' Corporate Security Department between

2016 and 2020.

      2.     Mack alleges that the terms, conditions, and privileges of his employment

relationships with Defendants have been adversely affected under: (i) the Fair Labor Standards

---

[1] Based upon Defendants' counsel's representations in their April 23, 2021 letter, ARGENBRIGHT HOLDINGS IV d/b/a ERMC AVIATION SERVICES d/b/a UNIFI has been withdrawn as a Defendant from prior pleadings. Mack reserves the right to reinstitute that entity as a Defendant later if it turns out that Defendants' counsel was incorrect or misleading.

Act, 29 U.S.C. § 201, et seq. ("FLSA"); and (ii) New York Labor Law §§ 195, 650-665, et seq. ("NYLL").

3.      Mack further alleges that with respect to his employment relationship with Defendants, the Defendants have violated: (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., as amended ("Title VII"); (ii) the Americans with Disabilities Act of 1990 ("ADA"); (iii) the New York State Human Rights Law as contained in New York Executive Law § 296 et. seq. ("NYSHRL"); and (iv) the New York City Human Rights Law § 8-107(1) et. seq. ("NYCHRL").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 to secure protection of and to redress the deprivation of Mack's rights secured by the ADA, Title VII, and the FLSA.

5.      Mack's federal, state, and city claims derive from a common nucleus of operative facts and form part of the same case or controversy. Therefore, this Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over Mack's state and city law claims arising under the NYLL, NYSHRL, and NYCHRL.

## PROCEDURAL REQUIREMENTS

6.      On or about June 5, 2020, Mack filed a timely charge with the Equal Employment Opportunity Commission ("EEOC").

     a.      On or about [2]November 2, 2020, the EEOC issued a Right to Sue Notice. A copy is annexed hereto as Exhibit 1. Mack's former counsel received this Right to

---

[2] The Defendants have provided Mack's current counsel with a separate Right to Sue Notice from the EEOC, issued October 19, 2020. Mack himself never received this Right to Sue Notice. Upon information and belief, Mack's former counsel never received this Right to Sue Notice either. Notably, the Right to Sue Notice had an incorrect state – Nebraska (NE) as opposed to New York (NY) – for the address for Mack's former counsel.

Sue Notice approximately 1 week thereafter. Mack himself never received this Right to Sue Notice.

b.      The original complaint in this action was filed on February 1, 2021, which was on or before 90 calendar days (or the business day following 90 days) from when Mack and/or his former counsel received the EEOC Right to Sue Notice.

7.      Accordingly, Mack timely filed the action herein.

## PARTIES

**Lance Mack**

8.      Mack is an African American Male.

9.      Mack worked for some or all of the Defendants from December 2016 to February 28, 2020. Mack was not a member of a union or subject to any type of collective bargaining agreement.

10.      The Defendants intentionally made Mack's employment relationship confusing such that, at times, he may have not known who his actual employer was. So too, he may have had multiple employers at once.

11.      At all times relevant, Mack was an employee within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

12.      Mack is a resident of the State of New York, County of Suffolk.

13.      Mack has over 34 years of professional experience in law enforcement and security.

**Defendants**

*Delta*

14.      Delta is a major international airline company and a legacy air carrier.

3

15.　　At all times relevant, Delta was and is a Delaware Corporation that is authorized to do business in the County, City, and State of New York.

16.　　At all times relevant, Delta was and is an employer within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

17.　　At all times relevant, Delta had and has employed approximately 90,000 employees.

18.　　As defined by the FLSA, Delta engaged and engages in interstate commerce and has revenue in excess of $500,000 per year.

*DGS*

19.　　At all times relevant, DGS was and is a subsidiary of Delta, and DGS was and is an employer within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

20.　　At all times relevant, DGS was and is an aviation services provider that offered aviation staffing and security-related services.

21.　　At all times relevant, DGS employed approximately 19,000 employees.

22.　　At all times relevant, DGS was and is an employer within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

23.　　As defined by the FLSA, at all times relevant, DGS engaged and engages in interstate commerce and has revenue in excess of $500,000.

*Agile1*

24.　　Agile1 represents itself to be a diverse group of companies that operates in 32 countries and that offers proprietary services and technologies in nearly every area of workforce management.

4

25.     Upon information and belief, Agile1 is a foreign corporation, which at all times relevant, was authorized to and did conduct business in the County, City, and State of New York.

26.     At all times relevant, Agile1 was and is an employer within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

27.     As defined by the FLSA, upon information and belief, Agile1 engaged and engages in interstate commerce and has sales in excess of $500,000 per year.

*Allsource*

28.     Allsource is a payroll management company that serves as the named employer for contingent workers affiliated with its company.

29.     Upon information and belief, at all times relevant, Allsource was and is a foreign corporation authorized to and conducts business in the County, City, and State of New York.

30.     At all times relevant, Allsource was and is an employer within the meaning of the ADA, FLSA, Title VII, and the other statutes referenced herein.

31.     As defined by the FLSA, upon information and belief, Allsource engaged and engages in interstate commerce and has sales in excess of $500,000 per year.

*O'Dwyer*

32.     At all times relevant, O'Dwyer served as General Manager of Delta's Corporate Security Department.

33.     At all times relevant, O'Dwyer served as Mack's direct supervisor.

34.     O'Dwyer acted directly and personally in the allegations stated herein.

35.     O'Dwyer personally and directly discriminated against, defamed, harassed, marginalized, and retaliated against Mack.

36.     O'Dwyer, along with the other Defendants, failed to pay Mack for overtime at a rate of 1.5x his regular rate for hours that Mack worked in excess of 40 hours per week. Alternatively, O'Dwyer, along with the other Defendants, failed to pay Mack at his regular hourly rate for hours that Mack worked in excess of 40 hours per week.

37.     O'Dwyer, along with the other Defendants, also misclassified Mack as an exempt and contingent worker, when, in fact, Mack was a non-exempt worker and employee of Delta.

38.     O'Dwyer is sued here in his individual capacity because he: (i) had the power to hire and fire Mack and others; (ii) supervised and controlled the work schedule and employment conditions of Mack and others; (iii) determined the pay rate and method of Mack and others; and (iv) maintained employment records of Mack and others.

***Coburn***

39.     At all times relevant, Coburn served as Director of Security Operations of Delta's Corporate Security Department.

40.     At all times relevant, Coburn served as Mack's indirect supervisor.

41.     Coburn also acted directly and personally in the allegations stated herein.

42.     Coburn personally and directly discriminated against, defamed, harassed, marginalized, and retaliated against Mack.

43.     Coburn also personally and directly refused to address Mack's complaints of discrimination and his requests for reasonable accommodations.

44.     Coburn, along with the other Defendants, failed to pay Mack for overtime at a rate of 1.5x his regular rate for hours that Mack worked in excess of 40 hours per week. Alternatively, Coburn, along with the other Defendants, failed to pay Mack at his regular hourly rate for hours that Mack worked in excess of 40 hours per week.

6

45.     Coburn along with the other Defendants, also misclassified Mack as an exempt and contingent worker, when, in fact, Mack was a non-exempt worker and employee of Delta.

46.     Coburn is sued here in his individual capacity because he: (i) had the power to hire and fire Mack and others; (ii) supervised and controlled the work schedule and employment conditions of Mack and others; (iii) determined the pay rate and method of Mack and others; and (iv) maintained employment records of Mack and others.

## FACTUAL ALLEGATIONS

**Background Information**

47.     In December of 2016, DGS hired Mack to work in the security department.

48.     In 2017, based upon his performance, Mack was promoted to Corporate Security Regional Representative.

49.     At this time, Mack worked as a "contingent" (a/k/a probationary) worker.

50.     In August of 2017, O'Dwyer became Mack's direct supervisor, even though Mack purportedly worked for DGS, and O'Dwyer worked for Delta.

51.     At that time, and up until his complaint of discrimination, Mack was the only African American that reported to and/or who was hired by O'Dwyer.

52.     In or about October of 2018, based on his performance, Mack was again promoted.

53.     At the time of his October of 2018 promotion, Mack was told that he went from being a "contingent worker" to a "merit employee."

54.     As a merit employee, Mack had vacation days and health benefits. During his employment with Defendants, Mack always performed duties and responsibilities unrelated to air transport for more than 20% of his workweek. These duties and responsibilities included, but were not limited to, when he:

7

    a.   oversaw security operations at designated Delta sites;

    b.   liaised with law enforcement and regulatory compliance agencies;

    c.   developed and implemented security programs to mitigate risk and reduce exposure;

    d.   conducted security site assessments to identify potential deficiencies;

    e.   developed corrective counter measures and collaborated with station leadership to enhance security operations;

    f.   prepared reports;

    g.   conducted confidential investigative employee interviews; and

    h.   presented investigative findings to Delta's HR and Legal Departments.

55.    The FAA classifies airports in 6 categories.

56.    Category X airports represent the nation's largest and busiest airports. These designations are based of the volume of passenger traffic, and their potential for being targets of criminal and terrorist activity.

57.    Category X airports require the highest level of security.

58.    There are currently 19 Category X Airports in the United States.

59.    The following types of airports may be designated as Category X:

    a.   Airports where 25,000,000 or more persons are screened annually;

    b.   Airports having 1,000,000 or more international enplanements;

    c.   Airports with special considerations (e.g. history of incidents, and airports in unique locations such as those serving Washington DC, etc.)

60.    By law, the provision of security in US Air travel is the responsibility of the: (1) FAA; (2) Airports; and (3) Air Carriers.

61.     Despite its legacy carrier status, Delta is required to comply with the tenets of the FAA. Delta is required to have a security program and to implement security measures.

62.     Air Carriers are responsible for the most visible security measures. These measures include the screening of passengers and carry-on baggage and the hiring and testing of persons responsible for the screening.

63.     Air carriers are also responsible for securing the aircraft against the introduction of any explosive or incendiary devices.

64.     In order to meet their FAA obligations, Air carriers may contract with private security firms, or they may work with other carriers at a given airport.

65.     Regardless of the methodology selected by the carrier, the FAA holds the individual air carriers accountable for the effectiveness of their screening operations.

66.     However, instead of simply working with security firms to meet their obligations under the FAA, Delta entered into various corporate structures and hired contingent workers to avoid providing them with health insurance, vacation pay, sick pay, overtime, and flight perks, and other Delta benefits.

67.     Within the approximately 3 years and 2 months that Mack worked for Defendants, Mack worked for the following entities in conjunction with Delta:

        a)  DGS from December 2016 until 2018. During this time period, DGS was a
            wholly-owned subsidiary of Delta;

        b)   In 2018 Argenbright Holdings/ERMC Unifi acquired a 51% stake in DGS; at
            that time, Mack continued to work under the management of DGS because
            Argenbright did not take over the supervision of his unit; and

   c) From approximately January of 2019 until February of 2020, Mack worked for Allsource/Agile1 and Delta.

68.   Defendants' intentionally misclassified, and thus, underpaid Mack as follows:

   a.   Defendants have failed and/or refused to pay Mack regular pay or overtime pay for the hours he worked in excess of 40 hours per work week within the meaning of the FLSA, NYLL Article 19 §§ 195 and 650 et. seq., and the supporting New York State Department of Labor Relations Regulations, 12 N.Y.C.R.R. Part 142.

   b.   Defendants have failed and/or refused to pay Mack a bonus hour for each day in which his workday ended more than 10 hours after it started, under New York's Spread of Hours law.

   c.   Defendants misclassified Mack as contingent and salaried to improperly exempt Mack from coverage of the overtime provisions of the NYLL and FLSA, as well as New York's Spread of Hours.

   d.   Defendants' policy of misclassifying Mack was done willfully.

69.   In addition to actively working 60+ hours per week, with his workday ending more than 10 hours after it started, Mack was on call 24/7/365 throughout the entirety of his employment.

70.   Mack had no autonomy with respect to his work schedules or assignments.

71.   Delta, O'Dwyer, and Coburn determined the work schedules and work assignments of Mack.

72.   Upon information and belief, in February of 2021, within a week or two after this lawsuit was initially filed, Delta notified all of Mack's former colleagues who were still employed with either DGS or Allsource that they should re-apply for their positions so that they could work

as Delta employees rather than DGS or Allsource employees. Upon information and belief, all were hired to work at Delta as full-time, merit employees.

73.    Upon information and belief, the following individuals went from being Contingent Corporate Regional Security Managers to Delta Regional Security Managers:

        a.  Sara Lervik ("Lervik") who is Caucasian/white;

        b.  Terry West ("West") who is Caucasian/white;

        c.  Robert Scott Rodine ("Rodine") from Minnesota who is Caucasian/white; and

        d.  Leo Ford ("Ford") who is Caucasian/white.

74.    Upon information and belief, Lervik, Rodine, and Ford all have less experience than Mack.

75.    Despite their experience and seniority, Lervik, West, Rodine, and Ford were all offered jobs as full time Delta employees – everyone except for Ford accepted.

76.    Additionally, none of the Regional Security Managers that worked internationally for Delta were African American.

77.    At all times relevant, Jurgen Beker ("Beker"), Andrew McGowan ("McGowan"), Ricardo Escobedo ("Escobedo"), and Michael Van Endt ("Van Endt") worked as Regional Security Managers at Delta's international locations. Escobedo worked internationally in Mexico (Mexico only) as a Regional Security Manager because only Mexican nationals can work Security at Airports in Mexico

78.    Beker, McGowan, Escobedo, and Van Endt performed the same job functions as Mack.

79.   Upon information and belief, Beker, McGowan, Escobedo, and Van Endt were paid more than Mack.

80.   Beker, McGowan, Escobedo, and Van Endt were salaried employees, while Mack was an hourly employee.

81.   Beker, McGowan, Escobedo, and Van Endt received vacation time, sick time, and other Delta perks.

82.   As a contingent worker, Mack did not receive vacation time, sick time, and Delta perks.

83.   Upon information and belief, Beker, McGowan and Van Endt are all Caucasian/white. Escobedo is Hispanic. None of them are African American.

84.   Despite Delta's recent hiring of the contingent Corporate Regional Security Managers, upon information and belief, Beker, McGowan, Escobedo, and Van Endt never worked as contingent workers, although they performed the same job functions as Mack.

**Defendants Deny Mack Overtime or Any Wages for Work in Excess of 40 Hours per week**

85.   Mack regularly worked more than 40 hours per week during a 52-week period.

86.   Mack worked at least 60 hours per week throughout his employment until he was unlawfully terminated.

87.   Defendants are liable under the FLSA and the NYLL for failing to properly compensate Mack for the overtime he performed between December of 2016 and February of 2020.

88.   Defendants took steps to ensure that Mack could not accurately record his work.

89.   Defendants outright refused to accept Mack's timesheets that reflected more than 40 hours of work per week.

90.     When Mack submitted timesheets that reflected that he worked more than 40 hours per week, Defendants would insist that Mack "correct" and complete the timesheets again.

91.      Mack was directed to change his timesheets to reflect that he worked only 40 hours per week, even though he actively worked more than that and was on call 24/7.

92.      Mack had the experience of his timesheets being returned/declined when he attempted to report his overtime.

93.     The timesheets reflect that Mack worked 40 hours per week. However, the reality was starkly different, as Mack regularly worked 60 to 80 hours per week (with his workday ending more than 10 hours after it started) without any additional compensation, whether at his regular rate or overtime rate. Nor was Mack paid the additional bonus hour for New York's Spread of Hours law.

94.     Pursuant to a Notice and Acknowledgement of Pay Rate and Payday Under Section 195.1 of the New York State Labor Law Notice For Hourly Rate Employees, which Allsource issued to Mack on or about April 23, 2019 (a copy is annexed hereto as Exhibit 2), Mack should have been compensated at a rate of at least $40.38 for each hour worked up to 40 hours per week, and an overtime rate of at least $60.57 for any work performed in excess of 40 hours in a given 7 day work week.

95.     Mack also should have been paid a bonus hour on all days in which his workday ended more than 10 hours after it started.

96.      Although Mack's hourly rate consistently increased during his 3+ years of his employment, pursuant to the aforementioned NYLL 195.1 Notice, Mack was supposed to be compensated at a rate of $60.57 for any overtime he worked. At a minimum, if he was somehow

ineligible for overtime, he should have been compensated at a rate of at least $40.38 for each hour worked above 40 hours per week.

97.     However, despite this requirement, from the beginning of his employment in December of 2016 until his termination in February of 2020, Mack regularly worked between 60 and 80 hours per week without compensation of any kind for the time that he worked above and beyond 40 hours per week, and he was not paid a bonus hour on all days in which his workday ended more than 10 hours after it started.

98.     Ultimately, the precise number of hours that Defendants failed to compensate Mack can be ascertained from Defendants' records.

99.     O'Dwyer ignored Mack's complaints about not being compensated for overtime or any time above 40 hours per week.

100.    Mack made a number of verbal and written complaints about not being paid for the overtime he worked. He also complained about his disproportionate workload.

**Mack Experiences a Hostile Work Environment**

*O'Dwyer's Discriminatory, Violent and Sexually Inappropriate Comments*

101.    During a transfer interview in August of 2017, Mack began to learn that he would be working in a hostile work environment under O'Dwyer.

102.    During Mack's interview, O'Dwyer gave an account of an incident where O'Dwyer chose to chase and physically assault a Latino employee.

103.    O'Dwyer conveyed to Mack that O'Dwyer suspected that the employee had engaged in prohibited behavior.

104.    Since the employee worked for the company, it was not necessary for O'Dwyer to apprehend and attack the employee. However, O'Dwyer did so anyway.

14

105.    It was clear to Mack that O'Dwyer's violent zealousness in pursuit of the Latino/Hispanic employee was rooted in racial animus.

106.    During O'Dwyer's account of the incident, O'Dwyer made the statement: "Latinos are like cue balls, the harder you hit them, the better their English gets."

107.    Even though Mack was concerned about O'Dwyer before Mack took the position, Mack hoped that O'Dwyer's comment was an aberration and not reflective of O'Dwyer's actual discriminatory animus.

108.    Mack was wrong to hope that O'Dwyer's statement was an isolated remark.

109.    Despite Mack's initial encounter and his reservations, Mack took the position because Mack was led to believe by O'Dwyer that the position would lead to Mack's formal employment with Delta.

110.    At the time that O'Dwyer hired Mack, O'Dwyer did not have any other African Americans who were direct reports.

111.    On countless occasions, O'Dwyer would make discriminatory remarks about Mack and other protected groups. Below are examples (but not an exhaustive list) of the statements made by O'Dwyer:

a)      On or about February 28, 2018, in front of a group of Mack's colleagues, O'Dwyer asked Mack: "Didn't I lock you up?" On that occasion, Mack had begun to make a name for himself with other Delta managers. Like many of the staff in Delta's Corporate Security Department, both Mack and O'Dwyer were former cops. At that time, it was clear that the racially tinged and inappropriate remarks were made to diminish Mack's employment prospects. O'Dwyer knew the connotation that his comments would have amongst his other former law enforcement peers and sought

15

to discredit Mack by making the racially tinged and completely untrue statement. In fact, Mack has and had a clean record until he left the NYPD and has never been arrested in his life.

b)      On another occasion, O'Dwyer sought to harass Mack by letting him know that he had worked in a neighboring precinct and that he knew some of Mack's former colleagues.

c)      To further harass Mack, O'Dwyer assigned him the heaviest workload of all Corporate/Regional Security Managers in the Corporate Security Department, without providing Mack with any training. Mack was assigned the most Category X Airports. Accordingly, Mack had more cases to address than any of his comparators. O'Dwyer set up Mack to fail.

d)      In April of 2018, when discussing an invitation to a golf outing in front of a Delta Regional Security Manager that Mack had developed a rapport with, O'Dwyer suggested that Mack should carry the golf bags as a caddie[3] rather than actually play golf with them. Again, O'Dwyer sought to undermine Mack professionally with discriminatory intent. O'Dwyer never made these types of inappropriate comments to white/Caucasian employees.

e)      In a conversation that Mack had with O'Dwyer on another occasion, O'Dwyer made racist and sexist comments about their African American colleague Nicole Sauce ("Sauce"). When he saw her, O'Dwyer commented: "she shakes her titties and ass at us and we do whatever she asks us to do." Again, Mack was disturbed by O'Dwyer's comments and his apparent belief that he could freely make those

---

[3] In the early days of golf, some courses would not allow African Americans on the course unless they were caddies.

types of comments. Further, Mack never heard O'Dwyer make sexist objectifying comments about white/Caucasian women.

112.    On March 6, 2019, by letter, Mack complained to Defendants about the comments and incidents that took place during his employment with Defendants. A copy of that letter is annexed hereto as Exhibit 3.

113.    Jose Requena ("Requena") provided a witness account that supported Mack's allegations of discrimination against O'Dwyer.

114.    Armando Cordoba also provided a witness account that supported Mack's allegations of discrimination against O'Dwyer.

115.    O'Dwyer intensified his harassment of Mack upon his complaint of discrimination and upon Defendants' determination that his discriminatory statements and conduct were not grounds for termination.

116.    O'Dwyer increased Mack's already disproportionate workload and intensified his verbal harassment of Mack at their twice a month team meetings.

117.    Defendants ultimately fired or failed to renew the employment of employees that corroborated Mack's claims about O'Dwyer's discriminatory comments.

118.    On March 29, 2019, Allsource issued a response e-mail to Mack after its investigation, which corroborated Mack's complaints. A copy of that response e-mail is annexed hereto as Exhibit 4. However, O'Dwyer did not experience any substantive punitive correction.

119.    When Mack complained to Defendants about O'Dwyer's retaliatory actions, they:

     a)     chastised Mack;

     b)     told Mack that O'Dwyer had a right to block his pursuit of other positions both on site and elsewhere;

17

    c)      stated that Delta's findings would stand as is;

    d)      said that his request for an accommodation would pose an undue hardship; and

    e)      instructed Mack to move forward with O'Dwyer since O'Dwyer had shown a willingness to do so on his end.

120. Mack complained about the inadequacy of the investigation to Defendants. He pointed out that his witnesses corroborated his account of O'Dwyer's racially inappropriate comments and conduct.

121. Mack also complained that Defendants were forcing him to work in a hostile work environment with O'Dwyer.

122. Ultimately, Mack was never removed from O'Dwyer's supervision.

123. O'Dwyer never experienced any materially adverse employment actions in the wake of his conduct towards Mack. Instead, Delta inexplicably concluded, in pertinent part: "While the above confirmed comments warrants the need for them to be addressed and corrected with John, it did not warrant further adverse action."

124. Defendants further conveyed to Mack that O'Dwyer's statements were "not in good taste" and were "inappropriate attempts at humor."

125. However, despite their assessment of O'Dwyer's statements, Defendants also conveyed to Mack that O'Dwyer's conduct was not grounds for termination.

126. Mack was further told that since O'Dwyer was willing to proceed with it in good faith, that he should also be willing to do so.

127. In fact, until his termination, Mack would continue to hear either directly or indirectly from others about O'Dwyer's animus towards racial minorities.

18

128.    Within a month of Mack's complaint of discrimination, Defendants then hired another African American, Troy Scott ("Scott").

129.    Until then, Mack was the only African American to directly report to O'Dwyer.

130.    Scott was hired as an attempt to disguise Defendants' discriminatory and retaliatory animus.

131.    O'Dwyer never made discriminatory or inappropriate comments about white/Caucasians.

132.    O'Dwyer would speak to Mack and other African American and Latino staff in a more hostile, aggressive, and unprofessional fashion.

133.    O'Dwyer never conducted himself this way with white/Caucasian staff members.

134.    On December 18, 2019, O'Dwyer yelled at Mack in front of other African American and Latino staff: "I am the General Manager and I shouldn't have to do this shit!"

135.    O'Dwyer directed the comment to Mack despite the fact that Mack was not responsible for him having to address the case.

136.    In comparison, when O'Dwyer had to fill in for white/Caucasian employees, Mack never witnessed O'Dwyer using profanity or yelling at them. O'Dwyer was professional and patient with white/Caucasian employees.

137.    O'Dwyer's animus became even more apparent during his one-on-one semi-monthly meetings with Mack.

138.    O'Dwyer would use the meetings as a means to further harass Mack. During the meetings, O'Dwyer would berate Mack, suggest that Mack was not grasping the concepts, and O'Dwyer would make racially derogatory comments.

139.   O'Dwyer would purposely schedule meetings with Mack so that it would coincide with rush hour. This would have the effect of doubling if not tripling Mack's commute home.

140.   During these meetings, even if O'Dwyer had nothing to say to Mack, O'Dwyer would insist on keeping Mack there until the peak of rush hour. During the course of these meetings, when O'Dwyer was sure that Mack would be stuck in traffic, O'Dwyer would comment that it would be a good time to end the meetings.

141.   One of the more egregious examples of O'Dwyer's comments took place in July of 2018. During one of the one-on-one meetings with Mack, O'Dwyer told Mack that Mack made participants at their meetings uncomfortable because his skin was "too dark" (Mack is a dark complexioned African American).

142.   O'Dwyer made the comment and many others like it to further demean, degrade, and demoralize Mack.

143.   After many comments of this nature at the bi-monthly meetings, during conference calls, during gatherings with O'Dwyer, Mack began to dread coming to work.

144.   Mack's colleagues expressed concern to Mack about O'Dwyer's racist comments and harassment.

145.   O'Dwyer made Mack's environment so hostile that he experienced sleeplessness, anxiety, and depression.

146.   In January of 2019, after performing the work of more than three people for almost a year, Mack came down with the flu and other medical complications.

147.   O'Dwyer was on notice of Mack's illness and his need for rest.

148.    Instead of allowing Mack to rest, O'Dwyer harassed him. O'Dwyer and Defendants insisted that Mack was a 24/7/365 on-call employee, despite the fact that they failed to compensate Mack accordingly.

149.    Nevertheless, Mack was expected to be on call 24/7/365.

150.    Mack complained to O'Dwyer and Defendants about these blatant violations of the law.

151.    O'Dwyer harassed Mack while Mack was out sick and being uncompensated.

152.    On the two days that Mack was out sick, O'Dwyer repeatedly called Mack and asked when Mack was going to return to work.

153.    Immediately upon Mack's return, O'Dwyer then placed Mack on a fugazi Performance Improvement Plan ("PIP").

154.    The manufactured premise of the fugazi PIP was that Mack needed to improve his accessibility and communication. A copy of that PIP is annexed hereto as Exhibit 5.

155.    Notably, as evidence of the fact that Mack worked more than 60 hours per week and was a 24/7/365 on-call employee, the PIP stated, in pertinent part:

    a.  "In the event there is an incident within your area of responsibility on the off hours (evening and weekend) you are expected to engage with the 'station' the DCC or me."

    b.  "During Off hrs you need to respond to email, text messages or calls to your cell phone. You are given the smart phone and laptop in the event there is an incident during off hrs and we need to engage you."

156.    Although the PIP stated, "Office hours are 0800 x 1700 hrs with a 1 hr meal break," Mack consistently was forced to work above and beyond those timeframes, including travel time from airport to airport.

157.    O'Dwyer contended that he could not reach Mack on a 24/7 basis.

21

158.    O'Dwyer also made the racially tinged subjective assessment that Mack needed to improve his knowledge of the job and communications and that he was lazy.

159.    O'Dwyer made these comments despite Mack's disproportionate workload.

160.    Although O'Dwyer maintained that Mack's performance was sub-par, Mack was assigned 27 stations with 8 Category X sites.

161.    Category X sites have high foot traffic and are prominent targets for terrorist attacks.

162.    The sites that Mack was assigned had the most traffic of any of Delta's sites. Mack also had more Category X high traffic and high terrorist threat sites of any of Defendants' employees in Delta's Corporate Security Department. This was despite O'Dwyer's insistence that Mack's performance was deficient.

163.    Mack had 8 Category X high target terrorist sites, from February of 2018 until his termination in February of 2020.

164.    Prior to Mack's hire, Danny Soria (Soria) performed the same job functions as Mack.

165.    Mack was hired to relieve Soria of a disproportionate workload. 27 sites were found to be too many for Soria to monitor alone.

166.    Despite Defendants' alleged prioritization of security, from February of 2018 to May of 2019, Defendants allowed Mack to monitor all 27 sites with Category X sites by himself.

167.    Mack had to monitor all 27 of these sites by himself without any training from Soria, O'Dwyer, or anyone else.

168.    O'Dwyer was setting up grounds to terminate Mack by giving Mack a workload that would be impossible for Mack to maintain by himself.

169.     From 2016 to 2020, O'Dwyer never placed any white/Caucasian employees under his supervision on a PIP.

170.     Pursuant to the PIP, O'Dwyer was supposed to provide Mack with an update about his performance and his completion of tasks after 60 days.

171.     However, O'Dwyer failed to comply with the PIP, in March of 2019, Mack had not received a written assessment of his performance.

172.     Instead, without prior discussion with Mack, O'Dwyer arbitrarily extended the probationary period.

173.     Since O'Dwyer had failed to comply and since Defendants previously did not a have formal entity for Mack to complain to, in March of 2019, Mack complained to Allsource, Agile1 and Delta.

174.     DGS did not have complaint processes for employees who experienced discrimination and/or retaliation on the job.

***Mack Experiences Disparate Treatment under O'Dwyer***

175.     Before Mack, O'Dwyer did not have any African American direct reports.

176.     To rectify the lack of racial diversity amongst his staff, O'Dwyer begrudgingly hired Mack to support Soria.

177.     At the time of Mack's hire under O'Dwyer in August of 2017, Soria was monitoring all 27 airports throughout the North Eastern Region, including 8 Category X sites.

178.     For example, John F. Kennedy Airport, LaGuardia Airport, Newark Airport, and Dulles Airport are considered Category X sites.

179.     Soria alone, and later, with Mack, monitored all of these airports along with four other Category X sites by themselves.

180.    It was later conveyed to Mack that he was hired to share Soria's workload because Soria, who had over 20 years of experience, could not monitor all 27 sites by himself.

181.    When O'Dwyer hired Mack, O'Dwyer shared with Mack that Soria had a drinking problem and had been arrested for a DUI/DWI.

182.    O'Dwyer told Mack that Soria came to his (Soria's) job interview on crutches, and that Soria had been physically injured during an altercation at a bar.

183.    O'Dwyer conveyed to Mack that Soria was on crutches at his interview because Soria's assailant had hit him with his car.

184.    Despite being privy to all of this information, and the seriousness of the proposed job, O'Dwyer hired Soria.

185.    O'Dwyer continued to cover for Soria and ignore Soria's substance abuse throughout Soria's employment.

186.    Upon information and belief, Soria, a white/Caucasian, was permitted to come to work intoxicated.

187.    Mack witnessed that Soria regularly closed his door for extended periods of time.

188.    Soria was also allowed to work with a suspended driver's license due to a DWI/DUI.

189.    O'Dwyer confided in Mack that O'Dwyer knew that Soria had a DWI/DUI and that Soria's driver's license was suspended.

190.    O'Dwyer also confided in Mack that O'Dwyer knew that Soria needed to have a valid driver's license to work.

191.    Soria and Mack needed to have valid driver's licenses to perform their job functions.

24

192.    O'Dwyer also shared with Mack that O'Dwyer had hidden this information from Randy Harrison ("Harrison") and Delta management.

193.    O'Dwyer confided in Mack that if Delta management ever learned that O'Dwyer had concealed Soria's DWI/DUI and inability to drive, that both O'Dwyer and Soria would be terminated immediately.

194.    Despite Soria's ongoing substance abuse and inability to perform an essential function of the job, which was driving, O'Dwyer nevertheless covered for Soria.

195.    Upon information and belief, Soria was not in treatment for substance abuse during the relevant time period.

196.    O'Dwyer permitted Soria to work with the DUI/DWI and provided Soria with the support he needed to do so, including, hiring Mack to split the 27 sites they were tasked with monitoring.

197.    Ultimately, Soria was terminated in February of 2018 after his misconduct at a company retreat in Las Vegas at the New York New York Hotel.

198.    At the retreat, O'Dwyer and others made a number of racially disparaging remarks about Mack because Mack refused to participate in their misconduct.

199.    Soria eventually became intoxicated and was arrested because he got into a physical altercation with a prostitute.

200.    Soria was charged with public intoxication, assault and solicitation of prostitutes.

201.    O'Dwyer told Mack that Soria was also physically assaulted and injured by a prostitute.

202.    Due to Soria's conduct, Delta and its affiliates were banned from returning to the hotel for any future conferences.

203.    Unlike with Mack, O'Dwyer sought to help Soria in his pursuit of professional opportunities. This was despite Soria's ongoing issues with substance abuse and performance.

204.    After Soria's conduct at the New York New York Hotel, O'Dwyer told Mack that O'Dwyer had approached Harrison about suspending rather than firing Soria outright.

205.    O'Dwyer conveyed to Mack that Harrison rejected O'Dwyer's suggestion to suspend Soria. According to O'Dwyer, Harrison insisted that Soria be terminated because Soria had "damaged the Delta brand."

206.    Unlike with Mack, O'Dwyer continued to assist Soria in procuring and pursuing job opportunities, even after Soria had been terminated.

207.    O'Dwyer confided in Mack that O'Dwyer gave Soria a glowing recommendation when Soria sought a new position at ACT Activation.

208.    Consistent with Soria's performance issues at Delta, Soria was also terminated from ACT Activation within a year.

209.    O'Dwyer repeatedly advocated for and supported Soria, a white/Caucasian with known substance abuse problems.

210.    O'Dwyer did so despite Delta's so-called commitment to security.

211.    O'Dwyer knowingly allowed an impaired Soria to act as Corporate Regional Security Manager for 8 of the biggest terrorist target airports in the world.

212.    However, despite Mack's sustained performance for over two years, covering all 27 sites, including 8 Category X sites, and other positions at Delta, O'Dwyer engaged in an extensive vendetta and campaign to destroy Mack's career prospects.

213.    O'Dwyer allowed Mack to act as Corporate/Regional Security Manager for 27 sites with 8 Category X sites by himself, despite purportedly being placed on a pretextual PIP.

26

214.    After Soria's termination, Defendants have not assigned any white/Caucasian Corporate Security Managers in the Corporate Security Department 27 or more sites.

215.    After Soria's termination, Defendants have not assigned any white/Caucasian Corporate Regional Security Managers in the Corporate Security Department 8 or more Category X airports.

216.    Defendants hired O'Dwyer despite the fact that he was named as a defendant in a lawsuit where O'Dwyer was accused of proffering knowingly false testimony. See Stefan McIntosh v. City of New York…Detective John O'Dwyer, et al., 07-cv-00928-RJD-JMA (EDNY), which resulted in a $77,500 settlement payment to that plaintiff.

217.    O'Dwyer, who was then an NYPD Detective, was involved in the investigation of the shooting of Anthony Ervin.

218.    At the time, then Detective O'Dwyer's actions led to the wrongful imprisonment of a man for 27 months.

219.    O'Dwyer and his then-colleague willfully suppressed exculpatory testimony from two interviews they conducted. These interviews contained testimony that implicated another person in the shooting.

220.    Despite the accusations against O'Dwyer, the other Defendants' alleged practice of conducting background and security checks for its employees, and the other Defendants' alleged commitment to security and safety, the other Defendants hired and continue to employ O'Dwyer.

***O'Dwyer Further Retaliates: O'Dwyer Blocks Mack's Opportunities to Work in Other Positions at Delta***

221.    O'Dwyer's behavior became so egregious that Mack met with Coburn in April of 2019.

222.     A number of employees separated from Mack's department, and he took on their workloads. Mack performed the work of at least three employees by himself without additional compensation.

223.     Based on his performance and work ethic, several Delta managers began to take notice of Mack, and became interested in working with him.

224.     O'Dwyer defamed Mack to Delta managers when Mack sought other job opportunities.

225.     O'Dwyer would use racially tinged language and stereotypes to block Mack's job opportunities.

226.     Mack developed a rapport with Requena's manager, Mark Lucas ("Lucas"). Both were interested in working with Mack.

227.     O'Dwyer proactively sought to thwart Mack's professional opportunities with Requena and Lucas. Despite the fact that Mack had not openly expressed an interest to work with either, O'Dwyer took it upon himself to approach them about Mack and made the racially tinged comments that Mack was lazy and that he did not do enough work.

228.     O'Dwyer made these comments to Requena and Lucas despite the fact that Mack at the time was performing the work of three separate employees at the same time.

229.     At that time, Mack complained to Coburn about his (Mack's) workload and sought to be removed from his retaliatory and racially hostile work environment.

230.     Mack conveyed first to Coburn and then to Agile1 that on several occasions, between their meeting and his complaint, that he had been sought after by other Delta employees to work in their units.

231.    Mack conveyed to Defendants that word had gotten out about his work ethic and that these other Delta managers wanted to work with him.

232.    Mack also conveyed to Defendants that O'Dwyer had retaliated against him because of Mack's complaint.

233.    O'Dwyer told several of his co-workers that he made negative comments about Mack.

234.    O'Dwyer began to go around in an unsolicited fashion and ask employees at other airports if Mack had sought positions at their sites.

235.    Upon information and belief, O'Dwyer never engaged in this behavior with white/Caucasian employees.

236.    Instead of addressing Mack's repeated requests to be placed in other positions and his workload, Coburn pretended that he needed to review the situation.

237.    In May of 2019, O'Dwyer conjured up a story that Mack was late for a conference call.

238.    Based on O'Dwyer's false allegations, Allsource contacted Mack.

239.    Mack was able to prove that O'Dwyer had lied about him being late.

240.    Mack complained to Allsource again about O'Dwyer's discriminatory conduct and harassment.

241.    Allsource did not investigate Mack's claims of discrimination, they told Mack that they accepted Delta's findings instead.

242.    As recently as a month before his termination, Mack was sought after for work and mentorship by Delta below wing Director Michael Morrison ("Morrison").

243.    When O'Dwyer learned about Morrison's interest in Mack, he again began to make false and defamatory statements about Mack.

244.    Due to O'Dwyer's railroading, Mack was again denied a professional opportunity to work elsewhere.

245.    When Mack brought O'Dwyer's antics up to Defendants, he was told that O'Dwyer had a right to express his views about Mack to others.

246.    Mack was not given any additional feedback on the retaliatory PIP he was placed on until he was ultimately terminated on February 29, 2020. Mack was terminated on the specious premise that it was based on his performance.

247.    Upon information and belief, in March of 2020, Allsource/Agile1 and Delta ended the assignments/laid off of 800 "contingent employees."

248.    Defendants' animus was so intense towards Mack that they could not wait the additional month to end Mack's employment.

249.    However, since Mack's employment was not ended under the auspices of the pandemic, his separation from Delta/Agile1 is tainted by its designation as a termination under entirely separate grounds.

250.    Accordingly, because of Defendants' unlawful conduct, Mack is unfairly precluded from pursuing employment with Delta sites and Allsource/Agile1.

251.    Due to the tightknit airport security community and due to the circumstances of his departure from Delta, Mack's employment prospects with other airlines and/or at other airports have also been negatively impacted.

**Defendants Fail to Engage in an Interactive Reasonable Accommodation Process**

252.    Although O'Dwyer claimed that Mack had performance issues, Mack had the most responsibilities and the highest number of Category X terrorist sites of all of O'Dwyer's direct reports.

253.    Mack performed these job functions without complaint until Mack sought to leave the hostile work environment that he experienced under O'Dwyer.

254.    O'Dwyer's abuse became relentless from the time of Defendants' "resolution" of his complaint in April of 2019 until the time Mack was ultimately terminated in February of 2020.

255.    Emboldened by the outcome of the investigation, O'Dwyer intensified his harassment of Mack.

256.    O'Dwyer began to call and badger Mack on almost a daily basis and at all hours of the day and night.

257.    O'Dwyer also increased the frequency of his one-on-one meetings with Mack, which O'Dwyer knew would exacerbate Mack's anxiety and depression.

258.    O'Dwyer did not meet with his other direct reports as frequently.

259.    O'Dwyer did not call and harass his other direct reports as much as he called Mack.

260.    Due to the sustained abuse, disproportionate workload, and harassment that Mack endured from O'Dwyer, Mack sought a reasonable accommodation.

261.    Mack contacted Defendants about two other Operational Manager positions for which he was approached and a Below the Wing position.

262.    Mack began to experience anxiety, depression and emotional distress after he suffered and complained of discrimination.

263.    O'Dwyer blocked these opportunities and stopped Mack's attempts to engage in an interactive process.

264.    None of the Defendants made any substantive effort to engage in an interactive process when Mack requested a reasonable accommodation of working for anyone but O'Dwyer.

265.    Defendants told Mack that his request to work elsewhere at Delta was unreasonable.

266.    None of the Defendants proposed any alternate positions either within Delta or elsewhere.

267.    Allsource said that Delta determined that Mack's request for an accommodation posed an undue hardship. Allsource stood by Delta's decision without offering any viable alternatives.

268.    Defendants insisted that Mack remain in a hostile and retaliatory work environment under O'Dwyer's supervision.

269.    Defendants maintained this position despite the fact that several Delta managers in other units had sought to work with Mack after he made his requests for accommodations.

270.    These managers were prevented from working with Mack based on O'Dwyer's campaign to end Mack's employment prospects.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act**
**Unpaid Regular Wages and/or Unpaid Overtime**
**Against All Defendants**

271.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

272.    Mack was an hourly, non-exempt worker under the FLSA.

273.    Mack regularly worked in excess of 60 hours per week, sometimes as many as 80 hours per week.

274.    Defendants failed to pay Mack a minimum of 20 hours of wages per week for the entirety of his employment.

275.    Mack received multiple raises throughout his tenure working for Defendants, earning a regular rate of as much as $43.75 per hour. Mack should have been compensated at a rate of at least his respective hourly rate for each hour worked up to 40 hours per week, and an overtime of least 1.5x his regular rate for any work performed in excess of 40 hours in a given 7 day work week. Alternatively, if Mack is ineligible for overtime under the Railway Labor Act or any other provision of law, then he still should have been compensated at a regular rate of at least $40.38 for each hour worked, regardless of how many hours he worked.

276.    However, Defendants had a policy and procedure of paying Mack for exactly 40 hours of pay per week, even though he always worked way more than that.

277.    Pursuant to the FLSA, Mack is entitled to recover all of the wages to which he is owed.

278.    Pursuant to the FLSA, Mack is entitled to liquidated damages of 100% of any unpaid wage amount.

33

279.    Pursuant to the FLSA, Mack is entitled to attorneys' fees.

280.    That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined by this Court.

## SECOND CAUSE OF ACTION
### New York Labor Law
### Unpaid Regular Wages and/or Unpaid Overtime
### Against All Defendants

281.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

282.    Mack was an hourly, non-exempt worker under the NYLL.

283.    Mack regularly worked in excess of 60 hours per week, sometimes as many as 80 hours per week.

284.    Defendants failed to pay Mack for a minimum of 20 hours per week for the entirety of his employment.

285.    Mack received multiple raises throughout his tenure working for Defendants, earning a regular rate of as much as $43.75 per hour. Mack should have been compensated at a rate of at least his respective hourly rate for each hour worked up to 40 hours per week, and an overtime of least 1.5x his regular rate for any work performed in excess of 40 hours in a given 7 day work week. Alternatively, if Mack is ineligible for overtime under the Railway Labor Act or any other provision of law, then he still should have been compensated at a regular rate of at least $40.38 for each hour worked, regardless of how many hours he worked.

286.    However, Defendants had a policy and procedure of paying Mack for exactly 40 hours of pay per week, even though he always worked way more than that.

287.    Pursuant to the NYLL, Mack is entitled to recover all of the wages to which he is owed.

288.    Pursuant to the NYLL, Mack is entitled to liquidated damages of 100% of any unpaid wage amount.

289.    Pursuant to the NYLL, Mack is entitled to attorneys' fees.

290.    That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined by this Court.

### THIRD CAUSE OF ACTION
**New York Labor Law**
**Unpaid Spread of Hours**
**Against All Defendants**

291.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

292.    Mack was an hourly, non-exempt worker under the NYLL.

293.    Mack regularly worked days in which his workday ended more than 10 hours after it started.

294.    Defendants failed to pay Mack a bonus hour on all days in which his workday ended more than 10 hours after it started.

295.    That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined by this Court.

**FOURTH CAUSE OF ACTION**
**Title VII, NYSHRL, and NYCHRL – Race Discrimination**
**Against All[4] Defendants**

296.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

297.    Mack has over 34 years of applicable professional experience.

298.    Mack was promoted twice during his tenure with Defendants.

299.    Based on his performance, Mack was pursued by several Delta managers.

300.    Also based on his competence, Mack was able to perform the work of three employees.

301.    Mack monitored 27 sites by himself, 8 of which were Category X sites.

302.    Mack was treated in a disparate fashion from his White/Caucasian comparator, Soria, as well as Delta's other White/Caucasian Corporate Regional Security Managers.

303.    Mack experienced discrimination under O'Dwyer because of Mack's race.

304.    O'Dwyer made discriminatory remarks to and about Mack and other African Americans. O'Dwyer also made racially discriminatory remarks about Latinos.

305.    Defendants' contingent worker programs had a disparate impact on Mack.

306.    During Mack's employment at Delta/Allsource/Agile1/DGS, racial minorities like Mack who were contingent workers in the Corporate Security Department were never hired as Delta employees, while white/Caucasian contingent workers in the Corporate Security Department were hired as Delta employees.

---

[4] The Title VII claims are not against Coburn and O'Dwyer

307. Defendants also treated Mack and other racial minorities in the Corporate Security Department in a disparate fashion.

308. White/Caucasian employees within the Corporate Security Department received favorable job assignments and job opportunities in comparison to Mack.

309. White/Caucasian employees who worked in the Corporate Security Department had fewer airports to monitor, were paid more and were more likely to obtain positions with Delta than Mack.

310. In February of 2020, Defendants terminated Mack's employment, at least in part, because of his race.

311. Since he was unlawfully terminated by Defendants, Mack has been unable to find comparable employment, despite reasonable efforts.

312. As a proximate result of Defendants' animus towards Mack, Mack has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

313. As a further proximate result of Defendants' actions, Mack has suffered and continues to suffer severe and lasting embarrassment, humiliation, and anguish, and other incidental and consequential damages and expenses.

314. Defendants' conduct was outrageous and malicious and was intended to injure Mack's civil rights. Therefore, Mack is entitled to an award of punitive damages.

315. That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in excess of ONE MILLION DOLLARS ($1,000,000.00), as well as punitive damages, costs, and attorneys' fees, and any other relief this Court may find just and proper.

## FIFTH CAUSE OF ACTION
### Title VII, NYSHRL, and NYCHRL – Hostile Work Environment
### Against All[5] Defendants

316.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

317.    O'Dwyer and Coburn are white/Caucasian.

318.    As fully detailed herein, Defendants created and permitted an environment where severe and pervasive unwelcome discrimination, retaliation, and harassment of Mack, based upon his race, were permitted without consequence.

319.    DGS, Agile1, Allsource, and Delta did not have complaint procedures that would afford Mack with recourse if they experienced discrimination.

320.    Defendants engaged in an inadequate investigative process, despite Mack's multiple complaints of discrimination.

321.    Defendants allowed O'Dwyer to openly thwart Mack's efforts to obtain other positions within Delta.

322.    O'Dwyer's conduct and vendetta were ongoing. He continued to block Mack's efforts to pursue other positions up until the last month of Mack's employment.

323.    The harassment was so severe and pervasive that it altered the conditions of employment and created a hostile or abusive working environment.

324.    As a result of the foregoing, Mack has lost wages, benefits, promotional and job opportunities, and bonuses.

---

[5] The Title VII claims are not against Coburn and O'Dwyer

325.     Mack has also suffered mental anguish, emotional distress, and has incurred damages.

326.     That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in excess of ONE MILLION DOLLARS ($1,000,000.00), as well as punitive damages, costs, and attorneys' fees, and any other relief this Court may find just and proper.

**SIXTH CAUSE OF ACTION**
**Title VII, NYSHRL, and NYCHRL – Retaliation**
**Against All[6] Defendants**

327.     Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

328.     On multiple occasions, Mack made protected complaints when he complained of discrimination and a hostile work environment to Defendants.

329.     For example, in March of 2019, Mack filed a discrimination complaint.

330.     On April 5, 2019, Defendants began to fabricate grounds to critique Mack's performance.

331.     In May of 2019, Defendants continued to lie about Mack's performance and punctuality. Mack refuted these allegations, and Mack again complained about racial discrimination.

332.     In February of 2020, Defendants terminated Mack's employment, at least in part, in retaliation for all of Mack's protected complaints of discrimination.

---

[6] The Title VII claims are not against Coburn and O'Dwyer

333.    As a proximate result of Defendants' actions, Mack has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

334.    Mack has also suffered mental anguish, emotional distress, and has incurred damages.

335.    That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in excess of ONE MILLION DOLLARS ($1,000,000.00), as well as punitive damages, costs, and attorneys' fees, and any other relief this Court may find just and proper.

**SEVENTH CAUSE OF ACTION**
**ADA, NYSHRL, and NYCHRL – Disability Retaliation and Failure to Accommodate Against All[7] Defendants**

336.    Mack hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Second Amended Complaint as though fully set forth in this paragraph of the Second Amended Complaint.

337.    At all times relevant, Mack suffered and still suffers from depression and anxiety, a protected disability under the ADA, NYSHRL, and NYCHRL.

338.    O'Dwyer's aforementioned conduct caused or aggravated the aforementioned disability conditions.

339.    Mack disclosed these disability conditions to Defendants and sought a reasonable accommodation.

340.    Specifically, Mack asked to be transferred to anywhere within Defendants' employment umbrella where Mack would no longer report to O'Dwyer.

---

[7] The ADA claims are not against Coburn and O'Dwyer

341.    Defendants failed to grant denied Mack's requests without offering alternatives.

342.    Defendants never engaged in an interactive process with Mack.

343.    In February of 2020, Defendants terminated Mack's employment, at least in part, in retaliation for Mack's reasonable accommodation request.

344.    As a proximate result of Defendants' actions, Mack has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

345.    Mack has also suffered mental anguish, emotional distress, and has incurred damages.

346.    That by reason of the foregoing, Mack suffered and continues to suffer irreparable injury and monetary damages in excess of ONE MILLION DOLLARS ($1,000,000.00), as well as punitive damages, costs, and attorneys' fees, and any other relief this Court may find just and proper.

**WHEREFORE,** Mack hereby demands a trial by jury on issues of fact and damages stated in this Complaint, and on any amended complaint filed in this action and as allowed under the Constitution and laws of the United States and New York State law.

Dated:  Bellmore, New York
            September 1, 2021

                                    Yours, etc.

                        By:    _____/s/ Evan Richards_____
                                Evan E. Richards, Esq. (ER 8382)
                                BAKER GREENSPAN & BERNSTEIN, ESQS.
                                *Attorneys for Plaintiff*
                                2099 Bellmore Avenue
                                Bellmore, NY 11710
                                516-783-3300
                                516-783-3311 (fax)

To:

Ira G. Rosenstein, Esq.
Liliya Kramer, Esq.
Morgan, Lewis & Bockius LLP
*Attorneys for Defendants*
101 Park Avenue
New York, NY 10178-0060